No. 25-10973-G

---

In the
# United States Court of Appeals
## for the Eleventh Circuit

❖———❖

**BOE, ET AL. v. MARSHALL, ET AL.
(IN RE: MELODY H. EAGAN & JEFFREY P. DOSS)
(IN RE: CARL CHARLES)**

❖———❖

On Appeal from the United States District Court
for the Middle District of Alabama
Hon. Liles C. Burke, United States District Judge
Case Number 2:22-CV-184-LCB-CWB

❖———❖

### APPELLEE'S BRIEF

❖———❖

Matthew H. Lembke
Riley A. McDaniel
Christopher A. Wetzel
J. Turner Collins
Bradley Arant Boult Cummings
LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
mlembke@bradley.com
rmcdaniel@bradley.com
cwetzel@bradley.com
tcollins@bradley.com

*Attorneys for Appellee*

No. 25-10973-G
Boe, et al. v. Marshall, et al.

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and 11th Cir. R. 26.1-1, Appellee, by and through its undersigned counsel, hereby submits the following list of all trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this case, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to any party:

1.  Alliance Defending Freedom – Counsel for Defendants

2.  Assaf, Eugene F. – Counsel for Respondent

3.  Austin, Sarah – Counsel for Plaintiff

4.  Badham & Buck LLC – Counsel for Respondent

5.  Bailey, Daryl D. – Defendant

6.  Bainbridge Mims Rogers & Smith LLP – Counsel for Respondent

7.  Balkoski, Katherine – Counsel for Respondent

8.  Barnes, Brian W. – Counsel for Defendants

9.  Beaverstock, Hon. Jeffrey U. – United States District Judge

No. 25-10973-G
Boe, et al. v. Marshall, et al.

10.  Berg, Rachel – Counsel for Plaintiff

11.  Bowdre, Alexander Barrett – Counsel for Defendants

12.  Bradley Arant Boult Cummings LLP – Counsel for Appellee

13.  Brooks, Roger G. – Counsel for Defendants

14.  Brown, Ashley C. – Counsel for *Amici Curiae* Law Professors

15.  Bryan, Hon. Chad W. – U.S. Magistrate Judge

16.  Buck, Brannon Jeffrey – Counsel for Respondent

17.  Burke, Hon. Liles C. – United States District Judge and
     Appellee

18.  Caplan Cobb LLC – Counsel for *Amici Curiae* Law
     Professors

19.  Carr, Danny – Defendant

20.  Carroll, Maureen S. – *Amicus Curiae* Law Professor

21.  Charles, Carl Solomon – Respondent

22.  Collins, J. Turner – Counsel for Appellee

23.  Cooper & Kirk, PLLC – Counsel for Defendants

24.  Copeland Franco Screws & Gill – Counsel for Respondent

25.  Crocker, Champ – Defendant

26.  Davis, James William – Counsel for Defendants

No. 25-10973-G
Boe, et al. v. Marshall, et al.

27.    Dominick Feld Hyde, P.C. – Counsel for Respondent

28.    Doss, Jeffrey P. – Respondent / Appellant

29.    Driver, Christopher B. – Counsel for Respondent

30.    Eagan, Melody H. – Respondent / Appellant

31.    Eber, Michael L. – Counsel for *Amici Curiae* Law Professors

32.    Eggleston, Warren Neil – Counsel for Respondent

33.    Esseks, James D. – Respondent

34.    Eversheds Sutherland LLP – Counsel for *Amici Curiae* Law
       Professors

35.    Farella Braun & Martell LLP – Counsel for Respondent

36.    Faulks, LaTisha Gotell – Respondent

37.    Fleming, John H. – Counsel for *Amici Curiae* Law Professors

38.    Frampton, Henry W. IV – Counsel for Defendants

39.    Franklin, Samuel H. – Counsel for Respondent

40.    GLBTQ Legal Advocates & Defenders – Counsel for
       Plaintiffs

41.    Gugliuzza, Paul R. – *Amicus Curiae* Law Professor

42.    Hartnett, Kathleen Roberta – Respondent

43.    Holliday, Shannon Lynn – Counsel for Respondent

44.    Human Rights Campaign Foundation – Counsel for

Plaintiffs

45.    Ides, Allan – *Amicus Curiae* Law Professor

46.    Jenner & Block LLP – Counsel for Respondent

47.    King & Spalding – Counsel for Plaintiffs

48.    King, Mark Christian – Counsel for Respondent

49.    Kirkland & Ellis LLP – Counsel for Respondent

50.    Klugh, Richard C. – Counsel for Appellants

51.    LaCour Jr., Edmund Gerard – Counsel for Defendants

52.    Lembke, Matthew H. – Counsel for Appellee

53.    Levi, Jennifer L. – Respondent

54.    Lightfoot, Franklin & White LLC – Counsel for Respondent

55.    Macfarlane, Katherine A. – *Amicus Curiae* Law Professor

56.    Markus, David Oscar – Counsel for Appellants

57.    Marshall, Steve – Defendant

58.    McCoy, Scott D. – Respondent

59.    McDaniel, Riley A. – Counsel for Appellee

60.    McKay, Charles A. – Counsel for Defendants

61.    Mills, Christopher Ernest – Counsel for Defendants

No. 25-10973-G
Boe, et al. v. Marshall, et al.

62.  Minter, Shannon – Respondent

63.  National Center for Lesbian Rights – Counsel for Plaintiffs

64.  Office of the Alabama Attorney General – Counsel for
     Defendants

65.  Orr, Asaf – Respondent

66.  Otterberg, April A. – Counsel for Respondent

67.  Pacheco, Byron – Counsel for Respondent

68.  Patterson, Peter A. – Counsel for Defendants

69.  Pedro, Portia – *Amicus Curiae* Law Professor

70.  Peterson, Misty L. – Counsel for Plaintiffs

71.  Prater IV, Harlan I. – Counsel for Respondent

72.  Pratt, James Andrew – Counsel for Plaintiffs

73.  Proctor, Hon. R. David – United States District Judge

74.  Ragsdale, Barry Alan – Counsel for Respondent

75.  Ramer, John D. – Counsel for Defendants

76.  Reinke, Adam – Counsel for Plaintiffs

77.  Remar, Robert – Counsel for Appellants

78.  Rogers, Bruce Frederick – Counsel for Respondent

79.  Schoenberg, Anthony Paul – Counsel for Respondent

80.    Sechler, Philip A. – Counsel for Defendants

81.    Segall, Robert David – Counsel for Respondent

82.    Seiss, Benjamin Matthew – Counsel for Defendants

83.    Shortnacy, Michael B. – Respondent

84.    Soto, Diego Armando – Counsel for Plaintiffs

85.    Southern Poverty Law Center – Counsel for Plaintiffs

86.    Spero Law LLC – Counsel for Defendants

87.    Stoll, Christopher F. – Counsel for Plaintiffs

88.    Stone, Jessica Lynn – Counsel for Plaintiffs

89.    Tarbox, James H. – Defendant

90.    Terenzi, Elizabeth Nicholson – Counsel for Respondent

91.    Thompson, David H. – Counsel for Defendants

92.    Thornburg, Elizabeth G – *Amicus Curiae* Law Professor

93.    Ugai, John Michael – Counsel for Respondent

94.    Unikowsky, Adam Granich – Counsel for Respondent

95.    Vague, Amie A. – Counsel for Plaintiffs

96.    Vance III, Robert Smith – Counsel for Respondent

97.    Ventiere, Jessica – Defendant

No. 25-10973-G
Boe, et al. v. Marshall, et al.

98.   Waddell, Timothy Brandon – Counsel for *Amici Curiae* Law Professors

99.   Warbelow, Sarah – Counsel for Plaintiffs

100.  Wasserman, Howard M. – *Amicus Curiae* Law Professor

101.  Watkins, Hon. William Keith – United States District Judge

102.  Weaver, Cynthia Cheng-Wun – Counsel for Plaintiffs

103.  Wetzel, Christopher A. – Counsel for Appellee

104.  Whelan, Amy – Counsel for Plaintiffs

105.  Wilson, Jenny – Counsel for Appellants

106.  Wilson, Thomas Alexander – Counsel for Defendants

Pursuant to 11th Cir. R. 26.1-3, Appellee certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted,

/s/ *Matthew H. Lembke*
Matthew H. Lembke
*Attorney for Appellee*

## STATEMENT REGARDING ORAL ARGUMENT

This appeal involves the application of settled legal principles to the district court's factual findings. Oral argument is not likely to materially aid this Court.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
DISCLOSURE STATEMENT ....................................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF AUTHORITIES ................................................................................ viii

STATEMENT OF JURISDICTION.......................................................................1

INTRODUCTION ...................................................................................................3

STATEMENT OF THE ISSUES............................................................................4

STATEMENT OF THE CASE ...............................................................................5

    A.    Nature of the case ...................................................................................5

    B.    Statement of the facts, course of proceedings, and disposition
below .......................................................................................................6

        1.    Two legal teams file separate lawsuits seeking to enjoin
an Alabama law concerning transgender medical
treatment for minors....................................................................6

        2.    *Ladinsky* is filed in the Northern District and assigned to
Judge Manasco, reassigned to Judge Cornelius, and
reassigned again to Judge Axon...................................................8

        3.    *Walker* is filed in the Middle District of Alabama and
assigned to Chief Judge Marks. ................................................10

        4.    Chief Judge Marks transfers *Walker* to the Northern
District, and the case is randomly assigned to Judge
Burke. ........................................................................................11

        5.    The *Ladinsky* and *Walker* teams agree to consolidate
their cases. .................................................................................13

6.    *Walker* and *Ladinsky* voluntarily dismiss their cases less than two hours after Judge Axon's transfer to Judge Burke. ......................................................................................14

7.    *Eagan* tells the press that the *Ladinsky* team will refile its case. ...........................................................................17

8.    Judge Burke issues a close-out order in *Walker*, noting the appearance of judge-shopping. ...........................................18

9.    The *Ladinsky* team refile in the Middle District with a group of different plaintiffs, and the case is reassigned to Judge Burke .................................................................19

10.    The Chief Judges of each United States District Court in Alabama convene a three-judge panel to investigate the actions of the *Walker* and *Ladinsky* attorneys. .........................21

11.    Charles testifies under oath to Panel that he never contacted Judge Thompson's chambers. ...................................23

12.    The Panel issues a report of its investigation findings. ............25

13.    The district court issues show-cause orders and holds hearings where Eagan, Doss, Charles, and all attorneys subject to the show-cause orders were given the opportunity to call witnesses, cross examine witnesses, submit evidence, and make closing arguments........................27

14.    The district court issues an order sanctioning Eagan, Doss, and Charles.....................................................................28

15.    Eagan, Doss, and Charles appeal the sanctions order..............32

C.    Standard of review.................................................................33

SUMMARY OF ARGUMENT .............................................................35

ARGUMENT .......................................................................................38

I.     The district court had authority to sanction Eagan, Doss, and Charles for their misconduct. .......................................................................38

     A.     A district court possesses inherent authority to sanction lawyers for bad-faith conduct that undermines the orderly administration of justice. ....................................................38

     B.     Judge Burke had authority to serve by designation in this case in the Middle District of Alabama. ...................................................40

II.    The sanctions imposed on Eagan and Doss for interference with two courts' judicial-assignment processes should be affirmed. ..........................42

     A.     Interference with a court's judicial-assignment process undermines the orderly administration of justice................................43

     B.     Eagan and Doss had advance notice that a scheme to evade the judicial-assignment process was sanctionable misconduct................45

     C.     Rule 41(a) does not provide immunity to Eagan and Doss to interfere with a court's judicial-assignment process.............................50

          1.     Eagan and Doss were not sanctioned merely for dismissing the *Ladinsky* complaint. ...........................................51

          2.     A lawyer cannot wield Rule 41(a) to engage in conduct that undermines the orderly administration of justice. .............52

          3.     Eagan and Doss's interpretation of Rule 41(a) would permit an attorney to select the judge to determine a legal controversy where multiple plaintiffs could assert the same claim...............................................................60

     D.     Zealous advocacy for a client does not excuse conduct that undermines the orderly administration of justice................................66

     E.     The district court's factual findings pertaining to Eagan and Doss in the sanctions order did not involve an abuse of discretion. ...........................................................................67

iv

1.    The district court permissibly rejected Eagan and Doss's contention that they merely wanted to ensure that they would have a randomly-assigned judge preside over their case. ........................................................................72

    a.    There was nothing improper about Judge Axon's transfer of *Ladinsky* to Judge Burke. ..............................72

    b.    The district court's finding that Doss and Eagan were not motivated by a desire to obtain a randomly-assigned judge is a permissible view of the evidence. ..................................................73

2.    The district court permissibly rejected Eagan and Doss's contention that their concern to retain first-filed status motivated their actions. .............................................79

3.    The district court permissibly rejected Eagan and Doss's contention that they acted based on their understanding of what Rule 41 permitted. .......................................81

F.    The district court did not abuse its discretion in disallowing expert testimony that Eagan and Doss sought to admit. ....................82

III.    The sanctions imposed on Charles for making false statements under oath to the investigatory panel should be affirmed. .......................................85

A.    A lawyer who testifies falsely in bad faith undermines the orderly administration of justice. .........................................86

B.    The district court did not err by applying the clear-and-convincing-evidence standard. ..........................................87

1.    Any error was invited because Charles advocated the clear-and-convincing-evidence standard that the district court applied. ..............................................87

2.    The beyond-a-reasonable-doubt standard does not apply in any event. ..............................................90

a.  The beyond-a-reasonable-doubt standard is not required for every punitive sanction. ............................91

b.  Potential consequences in separate proceedings do not trigger the beyond-a-reasonable-doubt standard. .........................................................94

c.  Charles overstates the contents of the district court's sanctions order. ...................................97

C.  The district court's finding of bad-faith misconduct by Charles was not an abuse of discretion. ...........................................99

1.  The district court permissibly concluded that Charles intentionally lied to the Panel in bad faith. ...............99

a.  The district court's findings represent a permissible view of the evidence. ...............................100

b.  Charles's attempts to undermine the district court's credibility finding do not demonstrate clear error. .......104

c.  Charles's alternative explanation based on forgetfulness is far from the only permissible one. ......108

IV.  The district court did not violate the due-process rights of Eagan, Doss, or Charles. ...........................................................111

A.  Due-process protections do not apply to investigatory proceedings. ......................................................111

B.  The show-cause proceedings provided notice and an opportunity to be heard. ...................................................115

1.  All appellants received adequate notice. ..................116

2.  All appellants had a full and fair opportunity to be heard. ......120

C.  The district court's show-cause proceedings moot any concerns with the Panel proceedings. ...........................................121

1.  The district court did not rely on the Panel's findings. ...........122

vi

2.    The district court cured any possible defects in the Panel's procedures. ..................................................126

3.    Doss, Eagan, and Charles all reasserted their Panel testimony and did not object to other respondents doing the same ....................................................................128

4.    Appellants were not prejudiced by the Panel's procedures. ...........................................................................129

CONCLUSION .........................................................................131

CERTIFICATE OF COMPLIANCE ..................................................133

CERTIFICATE OF SERVICE .........................................................134

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Absolute Activist Value Master Fund Ltd. v. Devine*,
  998 F.3d 1258 (11th Cir. 2021).....................................................54, 55

*Adams v. USAA Cas. Ins. Co.*,
  863 F.3d 1069 (8th Cir. 2017).......................................................59, 60

*Adkins v. Christie*,
  227 Fed. App'x 804 (11th Cir. 2007) (per curiam).....................98, 119

*Alderman v. United States*,
  394 U.S. 165 (1969)...........................................................................123

*Ambrose v. Ambrose*,
  309 A.3d 305 (Conn. App. Ct. 2024) ..................................................96

*Amlong & Amlong, P.A. v. Denny's, Inc.*,
  500 F.3d 1230 (11th Cir. 2007)....................................................34, 40

*Attorney Grievance Comm'n v. Bailey*,
  408 A.2d 1330 (Md. 1979) ..................................................................96

*Azar v. Garza*,
  584 U.S. 726 (2018) (per curiam)........................................................66

*Bechuck v. Home Depot U.S.A., Inc.*,
  814 F.3d 287 (5th Cir. 2016)...............................................................58

*In re BellSouth Corp.*,
  334 F.3d 941 (11th Cir. 2003) .........22, 35, 43–50, 55, 65, 83, 116–117

*Boe, et al. v. Marshall, et al.*,
  Case No. 2:22-cv-00184-LCB (M.D. Ala.) .............................................1

*Brnovich v. Democratic Nat'l Committee*,
  594 U.S. 647 (2021)............................................................. 34, 67, 106

*Brown v. Shalala,*
44 F.3d 931 (11th Cir. 1995) ........................................................... 129

*Burns v. Clayton,*
117 S.E.2d 300 (S.C. 1960) (per curiam) ......................................... 97

*Matter of Calvo,*
88 F.3d 962 (11th Cir. 1996) (per curiam) ........................... 95, 96, 115

*Carlucci v. Piper Aircraft Corp., Inc.,*
775 F.2d 1440 (11th Cir. 1985) ....................................................... 127

*Carrizosa v. Chiquita Brands Int'l, Inc.,*
47 F.4th 1278 (11th Cir. 2022) ........................................... 88, 90, 108

*Carter v. DecisionOne Corp. Through C.T. Corp. Sys.,*
122 F.3d 997 (11th Cir. 1997) ......................................................... 125

*Chambers v. NASCO, Inc.,*
501 U.S. 32 (1991) ................................................................ 33, 38, 39

*Cheshire Bridge Holdings, LLC v. City of Atlanta, Ga.,*
15 F.4th 1362 (11th Cir. 2021) ....................................................... 121

*Club Madonna, Inc. v. City of Miami Beach,*
924 F.3d 1370 (11th Cir. 2019) ....................................................... 126

*Commodores Ent. Corp. v. McClary,*
879 F.3d 1114 (11th Cir. 2018) ......................................................... 83

*In re Conduct of Benjamin,*
823 P.2d 413 (Or. 1991) (per curiam) ............................................... 96

*\*Cooter & Gell v. Hartmarx Corp.,*
496 U.S. 384 (1990) ............................................................. 34, 52, 53

*Corbitt v. Taylor,*
No. 2:18-cv-00091 (M.D. Ala. 2018) .................................................. 10

*Dailey v. Vought Aircraft Co.,*
141 F.3d 224 (5th Cir. 1998) ............................................................ 96

ix

*In re Deepwater Horizon BELO Cases*,
119 F.4th 937 (11th Cir. 2024) ................................................... 33, 82

*Matter of Disciplinary Action Against Dvorak*,
580 N.W.2d 586 (N.D. 1998) ............................................................. 113

*Donaldson v. Clark*,
819 F.2d 1551 (11th Cir. 1987) ............................................... 91, 92, 93

*Ford ex rel. Estate of Ford v. Garcia*,
289 F.3d 1283 (11th Cir. 2002) ........................................................... 88

*Federal Grievance Committee v. Williams*,
743 F.3d 28 (2d Cir. 2014) ....................................................... 113, 114

*In re Fieger*,
191 F.3d 451, 1999 WL 717991 (6th Cir. 1999) ................................. 55

*Fields v. Gates*,
233 F.3d 1174 (9th Cir. 2000) ............................................................ 57

*In re Finkelstein*,
901 F.2d 1560 (11th Cir. 1990)....................................... 45, 49, 50, 84

*In re Flanagan*,
690 A.2d 865 (Conn. 1997)................................................................ 113

*Frazier v. Se. Ga. Health Sys., Inc.*,
2025 WL 2257529 (S.D. Ga. Aug. 7, 2025) ........................................ 93

*Fuery v. City of Chicago*,
900 F.3d 450 (7th Cir. 2018)............................................................... 93

*In re Gillespie*,
2023 WL 7548181 (4th Cir. Nov. 14, 2023) ...................................... 119

*Matter of Gold*,
557 A.2d 1378 (N.J. 1989) (per curiam) ............................................. 96

*Goodyear Tire & Rubber Co. v. Haeger*,
581 U.S. 101 (2017)................................................................... 92, 93

x

*Government Employees Ins. Co. v. Nealey*,
    262 F. Supp. 3d 153 (E.D. Pa. 2017)....................................................93

*Greenbriar, Ltd. v. City of Alabaster*,
    881 F.2d 1570 (11th Cir. 1989).......................................................121

*In re Grodner*,
    587 Fed. App'x 166 (5th Cir. 2014)...................................................121

*Gust, Inc. v. Alphcap Ventures, LLC*,
    905 F.3d 1321 (Fed. Cir. 2018) ........................................................68

*Matter of Hawkins*,
    589 P.2d 247 (Wash. 1979) .............................................................113

*In re Henley*,
    518 S.E.2d 418 (Ga. 1999) .............................................................113

*Hernandez v. City of El Monte*,
    138 F.3d 393 (9th Cir. 1998)......................................................57, 58

*Int'l Driver Training Inc. v. J-BRJD Inc.*,
    202 Fed. Appx. 714 (5th Cir. 2006)....................................................58

*J.C. Penney Corp., Inc. v. Oxford Mall, LLC*,
    100 F.4th 1340 (11th Cir. 2024) ....................................33, 39–40, 103

*Johnson v. 27th Ave. Caraf, Inc.*,
    9 F.4th 1300 (11th Cir. 2021) ..........................................................39

*JTR Enter., LLC v. Columbian Emeralds*,
    697 F. App'x 976 (11th Cir. 2017)......................................................33

*Kaplan v. DaimlerChrysler, A.G.*,
    331 F.3d 1251 (11th Cir. 2003).......................................................119

*In re Karten*,
    293 Fed. App'x 734 (11th Cir. 2008)...................................................96

*Kleiner v. First Nat. Bank of Atlanta*,
    751 F.2d 1193 (11th Cir. 1985)............................... 1, 38, 91, 93–95, 97

*Kornhauser v. Comm'r of Soc. Sec.*,
    685 F.3d 1254 (11th Cir. 2012) ........................................ 119

*Ladinsky v. Ivey*,
    Case No. 5:22-cv-00447-LCB (N.D. Ala.) ........................... 1, 6

*Lanfear v. Home Depot, Inc.*,
    679 F.3d 1267 (11th Cir. 2012) .......................................... 88

*In re Liotti*,
    667 F.3d 419 (4th Cir. 2011) ............................................. 96

*Mago Int'l. v. LHB AG*,
    833 F.3d 270 (2d Cir. 2016) ............................................. 126

*Malautea v. Suzuki Motor Co., Ltd.*,
    987 F.2d 1536 (11th Cir. 1993) ................................... 66, 119

*Matthews v. Gaither*,
    902 F.2d 877 (11th Cir. 1990) ........................................... 54

*Matter of Mattox*,
    35 Fed. Cl. 425 (1996), *aff'd sub nom., In re Mattox*, 106
    F.3d 426 (Fed. Cir. 1997) .................................................. 86

*McCuin v. Tx. Power & Light Co.*,
    714 F.2d 1255 (5th Cir. 1983) ........................................... 60

*Musson v. Cook Jones*,
    2023 WL 7089941 (S.D. Ga. Oct. 26, 2023) ....................... 87

*In re Nave*,
    197 A.3d 511 (D.C. 2018) (per curiam) .............................. 96

*Nix v. Whiteside*,
    475 U.S. 157 (1986) ......................................................... 67

*Norman v. Montgomery Bd. of Educ.*,
    177 Fed. Appx. 939 (11th Cir. 2006) .................................. 73

*Office of Disciplinary Counsel v. Jackson*,
    691 N.E.2d 262 (Ohio 1998) (per curiam) .......................... 96

*Office of Disciplinary Counsel v. Salling*,
2013 WL 5737133 (Haw. Oct. 22, 2013) ............................................ 97

*Ogburia v. Cleveland*,
380 Fed. App'x 927 (11th Cir. 2010) ................................................ 126

*State ex rel. Oklahoma Bar Ass'n v. Bailey*,
530 P.3d 24 (Okla. 2023) ................................................................ 96

*Matter of Palmisano*,
70 F.3d 483 (7th Cir. 1995) ............................................................ 96

*In re Pendleton*,
870 N.W.2d 367 (Minn. 2015) ........................................................ 112

*People v. Jackson*,
943 P.2d 450 (Colo. 1997) (per curiam) ........................................... 96

*In re Peters*,
642 F.3d 381 (2d Cir. 2011) ............................................................ 59

*In re Petition for Disciplinary Action against Day*,
710 N.W.2d 789 (Minn. 2006) (per curiam) ..................................... 96

*Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*,
506 F.2d 914 (5th Cir. 1975) ..................................................... 54, 55

*Priva v. U.S. Attorney General*,
34 F.4th 946 (11th Cir. 2022) ....................................................... 129

*Reiterman v. Abid*,
26 F.4th 1226 (11th Cir. 2022) ..................................................... 125

*Rimmer v. Secretary, Fla. Dep't of Corrections*,
876 F.3d 1039 (11th Cir. 2017) ..................................................... 129

*In re Ruffalo*,
390 U.S. 544 (1968) ..................................................... 112–114, 123

*Sabal Trail Transmission, LLC v. 18.27 Acres of Land*,
59 F.4th 1158 (11th Cir. 2023) ....................................................... 47

*Schlumberger Technologies, Inc. v. Wiley*,
   113 F.3d 1553 (11th Cir. 1997) .............................................. 33, 48, 49

*Schware v. Bd. of Bar Exam'rs of N.M.*,
   353 U.S. 232 (1957) (Frankfurter, J., concurring) ............................ 86

*Selling v. Radford*,
   243 U.S. 46 (1917) ............................................................... 96

*Serra v. U.S. Att'y Gen.*,
   60 F.4th 653 (11th Cir. 2023) ................................................ 101, 103

*Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.*,
   75 F.4th 1290 (11th Cir. 2023) ............................................... 126

*Sosa v. Martin Cnty., Fla.*,
   57 F.4th 1297 (11th Cir. 2023) ............................................... 47

*Tang v. U.S. Atty. Gen.*,
   578 F.3d 1270 (11th Cir. 2009) .............................................. 102, 103

*Texas v. Cobb*,
   532 U.S. 162 (2001) ............................................................ 123

*The Florida Bar v. Rayman*,
   238 So.2d 594 (Fla. 1970) (per curiam) ...................................... 96

*Thomas v. Tenneco Packaging Co.*,
   293 F.3d 1306 (11th Cir. 2002) .............................................. 39, 84

*U.S. Dist. Court for Eastern Dist. of Washington v. Sandlin*,
   12 F.3d 861 (9th Cir. 1993) ................................................... 96

*United States v. Carl S. Charles*,
   2:25-cr-00489 (M.D. Ala. Aug. 19, 2025) .................................... 31

*United States v. Duldulao*,
   87 F.4th 1239 (11th Cir. 2023) .............................................. 88

*United States v. F.E.B. Corp.*,
   52 F.4th 916 (11th Cir. 2022) ............................................... 83

*United States v. Gonzalez,*
 718 Fed. App'x 905 (11th Cir. 2017) ................................................. 104

*United States v. McCullough,*
 851 F.3d 1194 (11th Cir. 2017) ......................................................... 73

*United States v. Robinson,*
 767 F.2d 765 (11th Cir. 1985) ........................................................... 129

*\*United States v. Shaygan,*
 652 F.3d 1297 (11th Cir. 2011) ........................... 34, 115–116, 120, 130

*United States v. Stone,*
 411 F.2d 597 (5th Cir. 1969) .............................................................. 73

*In re Unnamed Attorney,*
 595 A.2d 256 (Vt. 1991) ..................................................................... 113

*In re Vague,*
 Case No. 2:22-mc-03977 (M.D. Ala.) .................................................. 1

*Vaqueria Tres Monjitas, Inc. v. Rivera Cubano,*
 341 F. Supp. 2d 69 (D.P.R. 2004) ...................................................... 56

*In re Walden,*
 709 Fed. App'x 644 (11th Cir. 2017) .................................................. 115

*Walker v. Marshall,*
 Case No. 5:22-cv-00480-LCB (N.D. Ala.) ..................................... 1, 6

*In re White,*
 355 So.3d 1085 (La. 2023) (per curiam) ............................................. 96

*Williams v. Ala. Bd. of Educ.,*
 182 Fed. Appx. 868 (11th Cir. 2006) .................................................. 73

*Wolters Kluwer Fin. Servs. Inc. v. Scivantage,*
 564 F.3d 110 (2d Cir. 2009) .......................................................... 58, 59

*Zauderer v. Office of Disciplinary Counsel of Supreme Court*
 *of Ohio,*
 471 U.S. 626 (1985) ........................................................................... 112

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012) ................................................................. 83

**Statutes**

18 U.S.C. § 1623 ........................................................... 31, 90

18 U.S.C. § 1623(d) .............................................................. 104

28 U.S.C. § 295 ...................................................................... 41

28 U.S.C. § 1291 .............................................................. 2, 125

28 U.S.C. § 1292 .................................................................. 125

Ala. Code § 26-26-1, *et seq.* ................................................. 6

Alabama Vulnerable Compassion and Protection Act ............ 6–8, 19, 21

**Other Authorities**

Ala. R. Professional Conduct 3.3 ........................................... 119

Am. Bar Ass'n Model R. Prof. Conduct 3.3 ........................... 119

Brian Lyman, *Attorney: Plaintiffs Challenging Alabama's
Ban On Transgender Medicine Plan New Case*,
Montgomery Advertiser (Apr. 18, 2022),
https://perma.cc/3ZXS-UNJG ........................................... 18

11th Cir. R. 32-4 ................................................................. 133

Fed. R. App. P. 32(a)(5) ....................................................... 133

Fed. R. App. P. 32(a)(6) ....................................................... 133

Fed. R. App. P. 32(a)(7)(B) ................................................. 133

Fed. R. App. P. 32(f) ............................................................ 133

Fed. R. App. P. 32(g) ........................................................... 133

Fed. R. Civ. P. 11 ...................................................... 53, 91, 104

Fed. R. Civ. P. 11(c)(1)(B) ..................................................... 119

Fed. R. Civ. P. 41 ...........................................16, 50–51, 53, 55, 71, 81, 83

Fed. R. Civ. P. 41(a) ........ 3–4, 35–36, 47, 50–52, 54–57, 60–61, 63, 65–66

Fed. R. Civ. P. 41(a)(1) .................................................. 52–55, 58, 63, 65

Fed. R. Civ. P. 41(a)(1)(A) ...................................................... 57

Fed. R. Civ. P. 41(a)(1)(A)(i) .................................. 43, 52, 54, 59

Fed. R. Civ. P. 41(a)(1)(A)(ii) ................................................ 59

Fed. R. Civ. P. 41(a)(1)(B) .................................................... 52

Fed. R. Civ. P. 83(b) ............................................................ 46

Fed. R. Crim. P. 6(d) .......................................................... 114

Fed. R. Evid. 615 ............................................................... 23

Fed. R. Evid. 702 .......................................................... 82, 84

N.D. Ala. L.R. 83.1(f) ....................................................... 119

Paul Gattis, *Lawsuits Seeking To Overturn New Alabama
   Transgender Law Dropped, Could Be Refiled*, AL.com
   (Apr. 16, 2022), https://perma.cc/BU8R-UD8T ................................. 17

## STATEMENT OF JURISDICTION

The district court had jurisdiction to issue its sanctions order based on its inherent authority to impose sanctions for conduct that undermines the integrity of the judicial process. *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985).

When the appellants initially filed their notices of appeal, this Court lacked appellate jurisdiction because there was no final judgment in the underlying action. This Court issued a jurisdictional question requesting that the appellants advise the Court why the appeals should not be dismissed for lack of appellate jurisdiction. App. Doc. 26.[1] Two days after this Court issued that order, the plaintiffs in the underlying action voluntarily dismissed their lawsuit. Doc. 737.

---

[1] Citations to the docket in this appeal (Case No. 25-10973-G) are styled "App. Doc.__"; citations to the docket in *Boe, et al. v. Marshall, et al.*, Case No. 2:22-cv-00184-LCB (M.D. Ala.) are styled "Doc.__"; citations to the docket in *In re Vague*, Case No. 2:22-mc-03977 (M.D. Ala.) are styled as "*Vague*, Doc.__"; citations to *Ladinsky v. Ivey*, No. 5:22-cv-00447-LCB (N.D. Ala.) are styled "*Ladinsky*, Doc.__"; and citations to *Walker v. Marshall*, Case No. 5:22-cv-00480-LCB (N.D. Ala.) are styled "*Walker*, Doc.__." Citations to the record are to the page numbers that appear in the header generated by the district court's electronic filing system. Citations to appellants' and amici's briefs in this appeal are to internal page numbers.

As a result of the plaintiffs' dismissal of the underlying action, this Court obtained appellate jurisdiction pursuant to 28 U.S.C. § 1291 given that there was a final judgment.

## INTRODUCTION

A lawyer's interference with a federal court's judicial-assignment process strikes at one of the pillars of our judicial system. Our system relies on the presumption that every judge will provide a fair hearing to the parties in any case before the judge. It does not matter which President appointed the judge. It does not matter what legal and life experiences the judge brings to the bench. Consistent with those fundamental premises, a lawyer does not get to select which judge decides a particular legal question or controversy.

After Melody Eagan and Jeffrey Doss brought their constitutional challenge to a state statute on behalf of one group of plaintiffs, they believed that the case had been assigned to a judge unfavorable to their clients' position. Seeking to dodge that judicial assignment, they engineered a bad-faith contrivance so that a different judge would decide the constitutional question at issue. They insist that in any situation where multiple plaintiffs are available to bring the same legal challenge to a statute, a lawyer can wield Rule 41(a) of the Federal Rules of Civil Procedure to select the lawyer's preferred judge. In other words, under their interpretation of the rule, even if it takes filing a dozen or more

3

lawsuits until the lawyer draws the judge the lawyer wants, Rule 41(a) empowers the lawyer to engage in such conduct. But that jaundiced view cannot be squared with controlling precedents from the Supreme Court and this Court. The district court did not abuse its discretion in sanctioning Eagan and Doss for a bad-faith contrivance to interfere with the judicial-assignment processes of two federal district courts.

As for Carl Charles, he made false statements under oath and in bad faith to the investigative panel before which he appeared. Our judicial system relies on all witnesses providing truthful testimony, and a lawyer, who is an officer of the court, obviously cannot deviate from that requirement. The district court considered Charles's after-the-fact explanation for his false testimony and rejected it as not credible. In light of those findings, the district court committed no abuse of discretion in sanctioning Charles.

## STATEMENT OF THE ISSUES

1.    Did the district court abuse its discretion in imposing sanctions under its inherent power against Eagan and Doss for a bad-faith contrivance to interfere with the judicial-assignment procedures of two federal district courts?

4

2.    Did the district court abuse its discretion in excluding expert testimony offered by Eagan and Doss?

3.    Did the district court abuse its discretion in imposing sanctions under its inherent power against Charles for making false statements in bad faith to the investigative panel under oath?

4.    Did the district court violate the due-process rights of Doss, Eagan, or Charles in imposing sanctions on them?

## STATEMENT OF THE CASE

### A.    Nature of the case

This case involves sanctions imposed against three lawyers for bad-faith conduct that undermined the orderly administration of justice. The district court sanctioned Eagan and Doss for a contrivance to interfere with the judicial-assignment procedures of two federal district courts. The district court sanctioned Charles for intentionally lying under oath to an investigative panel.

**B.    Statement of the facts, course of proceedings, and disposition below**

**1.    Two legal teams file separate lawsuits seeking to enjoin an Alabama law concerning transgender medical treatment for minors.**

On April 7, 2022, the Alabama Legislature passed the Alabama Vulnerable Compassion and Protection Act ("Act"), which criminalized the administration of certain medical treatments to transgender minors. Ala. Code § 26-26-1, *et seq.* Governor Ivey signed the Act into law the next day.

Two separate legal teams comprised of advocacy groups and law firms immediately sued to enjoin the law. The first case, *Ladinsky v. Ivey*, Case No. 5:22-cv-00447-LCB (N.D. Ala.) (*Ladinsky*) was filed in the Northern District of Alabama on April 8, 2022. And the second case, *Walker v. Marshall*, Case No. 5:22-cv-00480-LCB (N.D. Ala.) (*Walker*), was filed in the Middle District of Alabama on April 11, 2022. The Act was set to go into effect in 30 days, and the goal for both teams was the same—enjoin the Act, which they believed harmed children, before it became effective. Doc. 642 at 94:2–17; *Vague*, Doc. 79 at 150:18–20; *Vague*, Doc. 77 at 78:8–14. As Doss put it, "given the Act's 30-day effective date, time was precious." *Vague*, Doc. 80-2 at 4.

6

Although these cases were filed in 2022, work on the litigation began years in advance. When the Alabama Legislature first considered the Act in 2020, advocacy groups like the National Center for Lesbian Rights ("NCLR"), the Southern Poverty Law Center ("SPLC"), GLBTQ Legal Advocates ("GLAD"), Lambda Legal ("Lambda"), and the American Civil Liberties Union ("ACLU") began evaluating how best to challenge the Act if it became law. *Vague*, Doc. 79 at 12:9–13:15, 123:4–19, 210:11–211:3; Doc. 640 at 87:25–88:1; Doc. 492 at 55–56.

In 2020, the *Ladinsky* team—made up of attorneys from GLAD, SPLC, NCLR, the Human Rights Campaign, King & Spalding, and Lightfoot Franklin & White—was formed. *Vague*, Doc. 79 at 11:11–12:23; *Vague*, Doc. 80-1 at 2; *Vague*, Doc. 80-2 at 2. Over the next several years, the *Ladinsky* team prepared to challenge the Act if passed by the Legislature, and then "temporarily disband[ed] the legal team after the legislative session ended." *Vague*, Doc. 79 at 12:24–13:15; *see Vague*, Doc. 80-2 at 2; *Vague*, Doc. 80-1 at 2. Eagan and Doss were local and lead counsel for the *Ladinsky* team. Doc. 642 at 99:25–100:6; *Vague*, Doc. 78 17:21–25.

7

The *Walker* team, which grew over time to include the ACLU, the ACLU of Alabama, Lambda, the Transgender Law Center, and Cooley LLP, also planned to challenge the Act as early as 2020. Doc. 640 at 87:25–88:1; Doc. 492 at 55–56. Charles, who has practiced law since 2014, was a senior attorney at Lambda and a member of the *Walker* team. Doc. 80-16 at 2.

### 2. *Ladinsky* is filed in the Northern District and assigned to Judge Manasco, reassigned to Judge Cornelius, and reassigned again to Judge Axon.

The *Ladinsky* team's plan—from the start—had been to file its case in the Northern District of Alabama. *Vague*, Doc. 79 at 20:3–21:13, 64:2–9; *Vague*, Doc. 80-2 at 3. That decision was based on the team's perceived chances of getting a "good draw" for a judge, the location of Eagan and Doss (as local counsel), and the location of the plaintiffs. *Vague*, Doc. 79 at 20:17–22:8; *Vague*, Doc. 80-1 at 3–4; *Vague*, Doc. 78 at 26:9–27:11.

Consistent with that plan, the *Ladinsky* team filed its complaint on April 8, 2022 in the Northern District of Alabama. *Vague*, Doc. 80-1 at 2. The case was initially assigned to Judge Manasco, who recused on April 11, 2022. *Id.* at 4. The case was then reassigned to Magistrate Judge

Cornelius; when the defendants did not consent to jurisdiction of a magistrate judge, it was reassigned again to Judge Axon. *Id.*

The *Ladinsky* team—based on information from Eagan and Doss—viewed this as a positive development based in part on Judge Axon's "family circumstances," which they believed would make her "sympathetic" to their case. *Vague*, Doc. 79 at 118:10–119:19, 33:15–25; *Vague*, Doc. 74 at 21:25–23:11; Doc. 636 at 17:17–20; Doc. 640 at 80:9–81:18. In particular, two *Ladinsky* attorneys explained that Eagan reported that Eagan's husband "was a law partner" of "the husband of Judge Axon" and that Axon's and Eagan's children had been involved in a "camp" or "schooling situation." Doc. 636 at 13:5–15; Doc. 640 at 80:9–81:18. According to Eagan, she believed that Judge Axon might have had "exposure to children who are LGBTQ" because Judge Axon had a child "involved with Red Mountain Theater." *Vague*, Doc. 78 at 47:25–48:11. Eagan thus viewed Judge Axon as a "favorable draw" because she thought "the whole parental rights issue, the right to make medical decisions for your children, would potentially resonate with [Judge Axon]" as a mother. *Id.* at 47:20–48:5.

9

### 3. *Walker* is filed in the Middle District of Alabama and assigned to Chief Judge Marks.

Since 2020, the *Walker* team had planned to file its case in the Middle District of Alabama and mark the case related to *Corbitt v. Taylor*, No. 2:18-cv-00091 (M.D. Ala. 2018)—a case assigned to Judge Thompson concerning Alabama's policy for marking gender on driver licenses. *Vague*, Doc. 77 at 133:2–134:18; Doc. 492 at 56–57.[2]  Consistent with that plan, the *Walker* team filed its complaint on April 11, 2022, and marked the case related to *Corbitt*.  Doc. 492 at 55–56.  But the case was assigned to Chief Judge Marks.  Doc. 642 at 46:13–17; *Vague*, Doc. 80-16 at 6, 21.

The next day (April 12), apparently unaware of that assignment, Charles was tasked with calling Judge Thompson's chambers to alert the court that the *Walker* team was preparing to file a motion for temporary restraining order and preliminary injunction.  *Vague*, Doc. 77 at 138:25–139:17, 140:20–141:15, 144:9–14; Doc. 492 at 61–63.  After learning that the case had already been assigned to Chief Judge Marks, the *Walker* team filed a motion to reassign the case to Judge Thompson that same

---

[2] At the time *Walker* was filed, *Corbitt* was on appeal to this Court. *Vague*, Doc. 77 at 133:21–24.

10

day.  *Walker*, Doc. 8; Doc. 492 at 60.  The *Walker* team then filed its motion for temporary restraining order and preliminary injunction. *Walker*, Docs. 9 and 10.  No one from the *Walker* team called Chief Judge Marks to alert her chambers of the forthcoming filing.  Doc. 642 at 42:21–43:18; *Vague*, Doc. 77 at 195:17–198:4.

### 4. Chief Judge Marks transfers *Walker* to the Northern District, and the case is randomly assigned to Judge Burke.

On April 13, 2022, Chief Judge Marks entered a show-cause order directing the parties to show cause by the next day why *Walker* should not be transferred to the Northern District where *Ladinsky* was pending. *Walker*, Doc. 3.  The *Walker* team considered opposing transfer "in light of the fact that the new law would go into effect 30 days after signing" and the fact that Walker had already "filed [its] motion for PI and TRO." Doc. 492 at 27.

While considering whether to oppose transfer, the *Walker* team held a conference call with the *Ladinsky* team where consolidation was discussed.  *Vague*, Doc. 79 at 23:24–26:4; *Vague*, Doc. 80-5 at 7–8; *Vague*, Doc. 80-1 at 5–6.  But the teams left the call with the impression that *Walker* preferred to stay in the Middle District in hopes of proceeding

before Judge Thompson, and the *Ladinsky* team preferred to stay in the Northern District in front of Judge Axon. *Vague*, Doc. 79 at 23:24–25:9; *Vague*, Doc. 80-5 at 7–8; *Vague*, Doc. 80-1 at 5–6; Doc. 492 at 29–30.

The *Walker* team also used the call to solicit opinions from Eagan about judges in the Northern District. *Vague*, Doc. 78 at 37:24–38:7. So Eagan offered her "personal opinion on how [she] thought [the] judges [of the Northern District] might receive [their] clients" and how those judges might receive the "controversial issues that people have very strong personal opinions about." *Id*. at 38:25–39:5.

Ultimately, the *Walker* team chose not to oppose transfer to the Northern District. They stated, "Plaintiffs do not oppose transfer to the Northern District so that this matter can be adjudicated alongside *Ladinsky*. Plaintiffs' interest is in the expeditious injunction of the unconstitutional law they challenge, and Plaintiffs will seek to pursue their motion for this preliminary relief expeditiously in the Northern District, assuming transfer." *Walker*, Doc. 18 at 3.

On April 15, 2022, Chief Judge Marks transferred *Walker* to the Northern District, *Walker*, Doc. 20, and the case was randomly assigned to Judge Burke. *Vague*, Doc. 109 at 32:5–20; Doc. 642 at 106:5–9.

12

**5.    The *Ladinsky* and *Walker* teams agree to consolidate their cases.**

After Walker was transferred, the *Ladinsky* and *Walker* teams agreed to consolidate their cases. *Vague*, Doc. 79 at 41:11–24; *Vague*, Doc. 77 at 47:3–48:10; *Vague*, Doc. 80-1 at 6–7; Vague, Doc. 80-2 at 5–6. To that end, the *Walker* team drafted a motion to consolidate for the *Ladinsky* team to file, which Eagan received at 3:17 p.m. on April 15, 2022. *Vague*, Doc. 80-1 at 6–7; *Vague*, Doc. 77 at 47:9–23, 152:19–153:20.

Around 45 minutes later, Eagan called Edmund LaCour, who was an attorney for the State at the time, to see if the State would agree to consolidation. *Vague*, Doc. 80-1 at 7; *Vague*, Doc. 78 at 68:13–72:7. On that call Eagan learned that the defendants planned to file a motion to consolidate, so Eagan consented to the State's motion on behalf of *Ladinsky*. *Vague*, Doc. 80-1 at 7; *Vague*, Doc. 109 at 41:23–42:24; *Vague*, Doc. 78 at 68:13–72:7. Eagan confirmed that consent in an email to LaCour at 4:20 p.m. *Vague*, Doc. 80-1 at 7–8; *Vague*, Doc. 109 at 41:23–42:24. The *Walker* team also consented to the State's motion to consolidate. *Vague*, Doc. 77 at 47:9–48:10; *Vague*, Doc. 109 at 42:16–19.

At 4:42 p.m., before the motion to consolidate was filed, Judge Axon transferred *Ladinsky* to Judge Burke "[i]n the interest of efficiency and

13

judicial economy." *Ladinsky*, Doc. 14; *Vague*, Doc. 80-1 at 8. Although the *Walker* and *Ladinsky* teams did not know this at the time, Judge Axon was in the middle of a criminal trial that was scheduled to continue into the next week. *Vague*, Doc. 109 at 33:10–22.

> **6.** ***Walker* and *Ladinsky* voluntarily dismiss their cases less than two hours after Judge Axon's transfer to Judge Burke.**

After Ladinsky was transferred to Judge Burke, *Ladinsky* attorneys at the NCLR (Shannon Minter and Asaf Orr) first discussed voluntarily dismissing the case on a call. *Vague*, Doc. 80-6 at 38, 54. At that point, Orr expressed "concern" that "dismissing Ladinsky and refiling a new case could be perceived as judge shopping." Doc. 640 at 38:19–39:13. But he ultimately came around to the idea of voluntarily dismissing the case. *Id*.

The *Ladinsky* team then held a broader call at 5:00 p.m., where the transfer and the prospect of succeeding in front of Judge Burke were discussed. *Vague*, Doc. 80-1 at 8–9. According to one attorney on the call, Eagan gave the impression that "the prospects of success were slim to none" based on Eagan's "read of the bench." Doc. 640 at 40:20–42:19. Another attorney "walked away from that phone call with the impression

14

that the view of Ms. Eagan was that it was unlikely, perhaps very unlikely that a preliminary injunction would be granted" by Judge Burke because he was a "conservative judge" with a background in Republican politics. Doc. 636 at 14:15–15:17. And another sensed that their prospects of success "were dim." Doc. 640 at 82:23–83:3. Although Eagan could not recall her exact words, she confirmed those assessments: "Slim, little chance would have been consistent with my opinion at the time." Doc. 642 at 90:11–22. That was based on her view that Judge Burke was "a conservative judge" and her perception of his "personal views on some of these issues." *Vague*, Doc. 78 at 49:14–50:19.

The *Ladinsky* team also discussed what they viewed as the unusual nature of the transfer to Judge Burke and losing their first-filed status. Doc. 642 at 139:1–24. According to Eagan, their "case seemed to have been treated differently" and they "were upset about it." *Id.* at 99:7–18. Eagan claimed the case had been transferred contrary to the "well established" procedure in the Northern District. *Vague*, Doc. 78 at 74:24–75:6. Doss similarly testified that they had a "politically controversial case," and what he "understood the procedure to be . . . didn't appear to be followed." Doc. 642 at 142:14–22; *accord Vague*, Doc. 80-2 at 7 ("Given

15

the political sensitivities of the *Ladinsky* Litigation, it gave me concern that there was an appearance of a different procedural rule being applied to the case.").

Doss thought "the case was being almost pulled over" to Judge Burke, which was a fact the team "did take into account" when evaluating their "prospects of potential success based on what [they] knew of [Judge Burke]." *Vague*, Doc. 78 at 268:20–24. And Eagan testified that the *Ladinsky* team thought, "gosh, maybe Judge Burke really wants this case, and somehow he decided—he got—but, again, it was speculation." *Id.* at 137:13–23.

In deciding whether to dismiss, the *Ladinsky* lawyers relied heavily on Eagan and Doss's knowledge of the Northern District's judges and procedures. Doc. 640 at 60:25–61:8, 69:5–9; Doc. 636 at 9:22–11:16, 17:17–20, 22:13–20. Ultimately, the *Ladinsky* team decided to voluntarily dismiss their case under Rule 41 and file a new lawsuit. *Vague*, Doc. 80-1 at 9; *Vague*, Doc. 80-2 at 8. The assignment to Judge Burke "absolutely" played a "role in that" decision. Doc. 642 at 145:6–11; *see also Vague*, Doc. 78 at 242:12–22.

16

The *Ladinsky* team informed the *Walker* team that they were thinking about dismissing their case, and the *Walker* team did the same. Doc. 636 at 50:11–20; *Vague*, Doc. 77 at 75:2–77:19, 80:4–23, 82:15–84:10. The teams then coordinated the dismissal of the cases—*Walker* was to be dismissed first and "the *Ladinsky* dismissal would be filed within minutes after *Walker*." *Vague*, Doc. 80-1 at 9–10; *see Vague*, Doc. 80-2 at 9; Doc. 636 at 50:11–20.

At 6:24 p.m.—less than two hours after agreeing to consolidation—the *Walker* plaintiffs voluntarily dismissed their case. *Walker*, Doc. 23; *Vague*, Doc. 109 at 42:22–24. Nine minutes later, the *Ladinsky* plaintiffs did the same. *Ladinsky*, Doc. 15; *Vague*, Doc. 109 at 42:25–43:2. The *Walker* counsel did not refile another case.

### 7. *Eagan* tells the press that the *Ladinsky* team will refile its case.

The day after the *Ladinsky* team dismissed their case, a reporter reached out to Eagan for comment about the dismissal. Eagan replied with the following: "We do plan to refile imminently, to challenge this law that criminalizes medical treatment accepted as the standard of care in the medical profession and deprives parents of their right to choose such medical care for their children." *Vague*, Doc. 80-1 at 11; *see also* Paul

17

Gattis, *Lawsuits Seeking To Overturn New Alabama Transgender Law Dropped, Could Be Refiled*, AL.com (Apr. 16, 2022), https://perma.cc/BU8R-UD8T.

Eagan gave a similar statement to the Montgomery Advertiser the next Monday: "Melody Eagan, an attorney with Birmingham-based Lightfoot, Franklin and White, which represented two families and two physicians in a lawsuit titled *Ladinsky v. Ivey*, wrote in an email Monday they planned to 'file a new case in the immediate future' against SB 184." Brian Lyman, *Attorney: Plaintiffs Challenging Alabama's Ban On Transgender Medicine Plan New Case*, Montgomery Advertiser (Apr. 18, 2022), https://perma.cc/3ZXS-UNJG.

### 8. Judge Burke issues a close-out order in *Walker*, noting the appearance of judge-shopping.

On Monday, April 18, 2022, Judge Burke issued an order denying as moot the *Walker* plaintiffs' motion for temporary restraining order and directing the Clerk of the Court to close the case. *Walker*, Doc. 24. In that order, Judge Burke recounted the events leading up to dismissal of the *Walker* and *Ladinsky* cases—as well as Eagan's statement to the press—and noted that the "Plaintiffs' course of conduct could give the appearance of judge shopping." *Id.* at 1–3. Judge Burke then directed

18

the Clerk of the Court to serve a copy of the order on counsel of all parties, the Chief Judge of each United States District Court in Alabama, and the Clerk of the Court for each United States District Court in Alabama. *Id.* at 3–4.

### 9.  The *Ladinsky* team refile in the Middle District with a group of different plaintiffs, and the case is reassigned to Judge Burke.

After dismissing their case on Friday, the *Ladinsky* team set to work over the weekend to assemble "a new slate of plaintiffs to challenge the Act." *Vague*, Doc. 80-2 at 10–11; *see Vague*, Doc. 80-1 at 12; *Vague*, Doc. 79 at 64:23–66:2.  After planning to file in the Northern District for two years, the *Ladinsky* team now formed a new plan to file in the Middle District.  That decision was made to avoid the appearance of judge shopping and to avoid the "irregular" case-assignment process they perceived in the Northern District.  Doc. 640 at 61:11–63:13; Doc. 642 at 104:2–12; *Vague*, Doc. 79 at 63:8–21; *Vague*, Doc. 80-1 at 12; *Vague*, Doc. 78 at 266:11–267:9, 267:19–268:24.

Eagan explained that she was "concerned that if [they] were to file in the Northern District, the case could be taken out of the random assignment process and assigned to Judge Burke." *Vague*, Doc. 80-1 at

19

12; *see* Doc. 642 at 104:2–12.  Doss further stated, "it's not that [they] were trying to get away from Judge Burke," but instead were just "trying to get away from being automatically assigned back to him on a related case basis and again finding [them]selves in a position where [they] felt like [they] did not have a randomly assigned judge." *Vague*, Doc. 78 at 267:21–268:2.  Eagan also believed that if they "filed a new action with the same plaintiffs," they "could be accused by the Defendants or in the press of 'judge shopping' so the cleanest path was to file a new action with new plaintiffs." *Vague*, Doc. 80-1 at 12.

And that is what the *Ladinsky* team did.  On Tuesday, April 19, 2022, they filed a new lawsuit with a new group of plaintiffs in the Middle District (the "*Eknes-Tucker*" action).  Doc. 1; *Vague*, Doc. 80-1 at 14; *Vague*, Doc. 80-2 at 11.  *Eknes-Tucker* was initially assigned to Judge Huffaker.  But to "manage the district court docket, promote the orderly and expeditious disposition of cases, and reassign a case to a judge who presided over a prior-related case," Judge Huffaker reassigned the case to Judge Burke to "sit by designation and preside over [the] case in the United States District Court for the Middle District of Alabama." Doc. 3. Judge Huffaker explained that the reassignment was made pursuant to

20

an "order of the Chief Judge of the United States Court of Appeals for the Eleventh Circuit," which allows "all United states District Judges in the State of Alabama" to "preside over cases in any of the State's three federal judicial districts." *Id*.

During the proceedings on the merits, Judge Burke granted in part the Plaintiffs' motion for preliminary injunction, enjoining enforcement of certain sections of the Act. Doc. 107.

> **10. The Chief Judges of each United States District Court in Alabama convene a three-judge panel to investigate the actions of the *Walker* and *Ladinsky* attorneys.**

After receiving Judge Burke's closing order in *Walker*, the Chief Judges of the United States District Courts in Alabama convened a three-judge panel (the "Panel"). *Vague*, Doc. 70 at 1; *Vague*, Doc. 109 at 3:8–4:3. The Panel was composed of a judge for each district: Judge Proctor, designated by Chief Judge Coogler, for the Northern District; Judge Watkins, designated by Chief Judge Marks, for the Middle District; and Chief Judge Beaverstock for the Southern District. *Vague*, Doc. 1 at 6.

On May 10, 2022, the Panel issued an order recounting the events leading to the dismissals of *Walker* and *Ladinsky* and the filing of *Eknes-Tucker*. *Id.* at 2–5. The Panel noted that "courts have inherent authority

21

to address lawyer conduct that abuses the judicial process" and that "judge shopping abuses the judicial process," citing, among other cases, *In re BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003). *Id.* at 5 & n.5. It ordered counsel in *Walker*, *Ladinsky*, and *Eknes-Tucker* to "appear before a three-judge panel" on May 20, 2022, to "allow the panel to inquire about the issues raised by counsel's actions." *Id.* at 5. The Panel's task was to determine whether counsel for the plaintiffs in these three cases "attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama." *Vague*, Doc. 70 at 1; *see Vague*, Doc. 109 at 3:13–4:1.

To complete that task, the Panel heard testimony from the 39 lawyers through five days of evidentiary hearings. *Vague*, Doc. 70 at 2, 11. The Panel also received written declarations *in camera* from 21 of the involved attorneys. *Vague*, Doc. 22 at 1–2; *Vague*, Doc. 80. Each attorney was placed under oath at the outset of the proceedings. *Vague*, Doc. 109 at 7:17–24. And all attorneys were represented by counsel at the start of the first hearing or soon after. *Id.* at 8:7–10:3; *Vague*, Docs. 10, 11, 12, 14, 15.

22

The panel respondents were grouped into one of three categories: (1) those with knowledge but no input; (2) those with knowledge and input; and (3) leaders and decision makers. *Vague*, Doc. 109 at 18:3–15; *Vague*, Doc. 70 at 11–12. Lawyers in the first category were interviewed by former Supreme Court of Alabama Justice R. Bernard Harwood, serving as special master, while the Panel took testimony from lawyers in the other categories. *Vague*, Doc. 109 at 74:15–76:24. For the duration of the proceedings, the Panel applied to both oral and written testimony a modified version of sequestration under Fed. R. Evid. 615. *Id.* at 74:9–14; *Vague*, Doc. 22 at 3–4 & n.3; *Vague*, Doc. 40 at 1–2.

### 11.  Charles testifies under oath to Panel that he never contacted Judge Thompson's chambers.

At the first day of the Panel proceedings, Charles was asked questions by the Panel concerning his involvement in the *Walker* case. During that questioning—while under oath—Charles was asked six times whether he ever called a judge's chambers about the *Walker* case. Each time he testified that he had made no such call. That was so despite Charles also testifying that "in preparation for th[e] hearing," he had

"endeavored to recollect and write down" the "many things that happened." *Vague*, Doc. 109 at 193:1–3.

Judge Watkins first asked Charles whether he called "anyone's chambers about the assignment of the case." *Id.* at 179:14–16. Charles testified "No, Your Honor." *Id*. Judge Watkins immediately followed up: "You didn't call any judge's chambers?" *Id.* at 179:17–19. Charles testified that he "did not make any telephone calls about this matter on the day we filed." *Id*. So Judge Watkins followed up again: "I'm not asking about the day you filed. I guess I'm asking about any day." *Id.* at 179:20–25. And again, Charles testified that he did "not recall ever calling any chambers with this request, Your Honor, at any point." *Id*.

The questions turned to a different topic before Judge Watkins again asked Charles about any calls to chambers—"So I've asked you the question. I'm going to ask you point blank: Are you telling us that you did not speak to any law clerk of any judge in the Middle District of Alabama concerning the Walker case and the assignment of the case to that judge?" *Id.* at 185:1–7. Charles provided the same answer again: "That is correct, Your Honor. I did not." *Id*.

24

The questions again turned to a different topic before Judge Proctor returned to the call: "Speaking of good faith, I want you to think very carefully about this next question and answer you're about to give. Are you telling us that you did not call a judge's chambers and speak to a law clerk about the potential for a TRO in the Walker case?" *Id.* at 187:6–19. After clarifying the question, Charles offered the same testimony—"No, Your Honor." *Id.*

Judge Proctor returned to the topic a final time. This time asking Charles "[i]f you did make a call to a judge's chambers and talk to a law clerk about the Walker case, you would remember that?" *Id.* at 191:2–10. Charles's response was clear: "I am incredibly certain I would, Your Honor." *Id.* At that point, Judge Proctor asked Charles to confirm his phone number, which he did. *Id.* And a few questions later, Charles asked to "amend [his] testimony," testifying for the first time that he "did call Judge Thompson's clerk." *Id.* at 192:7–19.

## 12. The Panel issues a report of its investigation findings.

The Panel issued its report of inquiry on October 3, 2023. *Vague*, Doc. 70. The 52-page report details the Panel's factual findings from its investigation. Based on its investigation, the Panel found "without

25

hesitation" that eleven attorneys, including Eagan and Doss, "purposefully attempted to circumvent the random case assignment procedures of the United States District Courts for the Northern District of Alabama and the Middle District of Alabama." *Id*. at 51.  The Panel also found that the "only reasonable reading of Charles's testimony [wa]s that, initially, he deliberately misled th[e] Panel about the phone call to Judge Thompson's chambers—and continued to do so up until the moment in his testimony that became clear to him that the Panel was fully aware of his call." *Id.* at 20.   The Panel directed the Clerk of the Court to serve the report on Judge Burke, "so he may proceed as appropriate." *Id*. at 52.

Eagan, Doss, and Charles filed notices of appeal later that month following the Panel's findings.  *Vague*, Docs. 86–87.  In response, the Panel issued an order, clarifying that its report was "neither a final decision" nor "an interlocutory decision" and "require[d] further proceedings before the Honorable Liles C. Burke." *Vague*, Doc. 99.  The order made clear that the additional proceedings could "include, but [we]re not limited to, accepting, rejecting, or modifying in whole or in part the Panel's findings and making additional findings of fact as necessary."

26

*Id.* Following that order, Eagan, Doss, and Charles dismissed their appeals. *Vague*, Docs. 101, 102.

> **13. The district court issues show-cause orders and holds hearings where Eagan, Doss, Charles, and all attorneys subject to the show-cause orders were given the opportunity to call witnesses, cross examine witnesses, submit evidence, and make closing arguments.**

On February 21, 2024, the district court issued an order to show cause why Eagan, Doss, Charles, and the other attorneys found by the Panel to have engaged in misconduct should not be sanctioned. Doc. 406. Eagan, Doss, and Charles filed objections and requests to clarify the show-cause order, arguing that the initial order did not sufficiently state how each attorney acted improperly. Docs. 423, 425, 432. The district court granted the request to clarify the show-cause order, Doc. 466, and issued individualized show-cause orders to each attorney. Docs. 478–488.

After the district court issued the supplemental show-cause orders, Eagan, Doss, and Charles were allowed to—and did—respond to the show-cause orders and submit additional evidence. Docs. 492, 495, 514, 517, 536, 537, 540. The district court held informal, in-chambers hearings, where Charles, Doss, and Eagan (and their attorneys) sat down with the district court to discuss their actions, how they intended to

present evidence and argument at the show-cause hearings, and anything else they wanted to discuss with the district court. Doc. 567 at 28:24–30:10, 43:16–67:25, 84:14–89:1.

The district court then held show-cause hearings on June 24, 2024, June 27, 2024, and June 28, 2024, where the attorneys were allowed to present evidence, cross-examine other witnesses, answer questions by the district court, and present closing arguments. Docs. 636, 640, 642. During the hearings, each attorney reasserted the testimony he or she had given to the Panel orally and in declarations and was given an opportunity to add to, clarify, or modify the prior testimony. Doc. 636 at 5:19–6:11, 51:23–52:15; Doc. 640 at 37:24–38:11, 83:4–16, 94:25–95:10, 120:2–13, 163:4–14, 189:24–190:11; Doc. 642 at 4:19–5:4, 82:11–20, 131:13–22. No attorney objected to any other attorney's reassertion of testimony. *Id.*

### 14. The district court issues an order sanctioning Eagan, Doss, and Charles.

After conducting the show-cause hearings, the district court entered a detailed, 230-page order that sanctioned certain attorneys—Eagan, Doss, and Charles—and released others. Doc. 711. The district court made detailed factual findings as to why Eagan, Doss, and Charles

28

should be sanctioned. *Id.* at 112–20, 127–41. And in making those findings, the district court "neither relied on, incorporated, nor deferred to the Panel's findings or conclusions." *Id.* at 153. Instead, although the district court's "findings partly rel[ied] on evidence the Panel gathered during its inquiry," its "findings rest[ed] on the written and testimonial evidence itself—not the Panel's findings." *Id.*

As for Eagan and Doss, the district court found that, based on "the totality of the circumstances," they "acted in bad faith when [they] dismissed *Ladinsky* and filed the materially similar *Eknes-Tucker* with new plaintiffs in another federal district court for the express and nefarious purpose of interfering with the random case-assignment procedures for the Northern and Middle Districts of Alabama and subverting the orderly administration of justice." Doc. 711 at 134, 141.

In making that determination, the district court considered in detail Eagan's and Doss's explanations for their actions. And the district court rejected those explanations (1) based on Doss's and Eagan's demeanor during the hearings; and (2) because their explanations strained credulity given the totality of evidence. Doc. 711 at 129–134, 137–40. Based on their misconduct, the district court sanctioned Eagan

29

and Doss—the district court disqualified them from the underlying litigation and publicly reprimanded them. *Id.* at 145–51, 229–30. As to the public reprimand, Eagan and Doss were ordered to provide a copy of the sanctions order to (1) their clients, opposing counsel, and the judge in every pending state and federal case in which they were counsel of record and (2) every attorney in their law firm. *Id.* The Court also directed the Clerk of the Court to submit the sanctions order for publication in the Federal Supplement and to serve a copy of the order on the General Counsel of the Alabama State Bar. *Id.*

As to Charles, the district court found that he "intentionally misrepresented or otherwise failed to disclose key facts to the Panel by testifying falsely about his call to Judge Thompson's chambers." *Id.* at 112. The district court considered and rejected Charles' justifications for his misconduct (1) based on Charles' demeanor during the show-cause hearing; and (2) because his explanations lacked merit based on the evidence presented to the district court. Doc. 711 at 113–20.

Based on Charles's misconduct, the district court sanctioned him with a public reprimand and $5,000 monetary sanction. Doc. 711 at 222–25, 229–30. As to the public reprimand, Charles was ordered to provide

a copy of the sanctions order to (1) his clients, opposing counsel, and the judge in every pending state and federal case in which he was counsel of record, (2) every attorney in his law firm if he had entered private practice, and (3) the U.S. Attorney General if he was still employed by the U.S. Department of Justice. *Id.* The Court also directed the Clerk of the Court to (1) submit the sanctions order for publication in the Federal Supplement, (2) serve a copy of the order on the state bar associations in which Charles was a member, and (3) refer the matter to the U.S. Attorney for the Middle District of Alabama to investigate whether Charles engaged in criminal conduct. *Id.*[3]

Eagan, Doss, and Charles each certified that they complied with the district court's public reprimand. Docs. 713, 714, 715.

The district court released the other eight attorneys subject to show-cause orders. Doc. 711 at 230. But to be clear, the district court did not find that these attorneys did not engage in an interference with the relevant judicial-assignment processes. Instead, the court found that

---

[3] A grand jury in the Middle District of Alabama has since indicted Charles for making a false statement before a court under 18 U.S.C. § 1623. *United States v. Carl S. Charles*, 2:25-cr-00489 (M.D. Ala. Aug. 19, 2025).

there was no need to address those attorneys' conduct because, among other reasons, no sanction was necessary to prevent these attorneys from engaging in future misconduct.  Doc. 711 at 109–12, 120–27.

> **15.   Eagan, Doss, and Charles appeal the sanctions order.**

After the district court entered its order, Eagan, Doss, and Charles noticed their appeals to this Court on March 28, 2025, and March 31, 2025.  Docs. 732–33.  On April 29, 2025, this Court issued a jurisdictional question, asking Eagan, Doss, and Charles to address whether their appeals were "taken from a final or otherwise appealable order, given that the private plaintiffs' claims [were] still pending."  App. Doc. 26-2.  On May 1, 2025, the *Eknes-Tucker* plaintiffs filed a joint stipulation of dismissal of the underlying case.  Doc. 737.  And on May 12, Eagan and Doss responded to the jurisdictional question, arguing that the Court had jurisdiction because the underlying litigation was dismissed and, alternatively, that the Court had jurisdiction under the practical-finality doctrine.  App. Doc. 27.  Charles argued that the sanctions order was a final, appealable decision because the order disposed of the only action in which he was a party or counsel.  App. Doc. 28.

After Eagan, Doss, and Charles filed their opening briefs, this Court ordered the Middle District of Alabama to file an appellee's brief for the Court's benefit.  Doc. 756; App. Doc. 51.

## C.    Standard of review

This Court reviews the district court's imposition of sanctions under its inherent power for abuse of discretion.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991); *JTR Enter., LLC v. Columbian Emeralds*, 697 F. App'x 976, 986 (11th Cir. 2017).[4]  The district court's factual finding of bad faith supporting inherent-authority sanctions is reviewed for "clear error." *J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F.4th 1340, 1346 (11th Cir. 2024).  In addition, this Court reviews the district court's exclusion of expert testimony for abuse of discretion.  *In re Deepwater Horizon BELO Cases*, 119 F.4th 937, 944 (11th Cir. 2024).

---

[4] While Charles concedes that an abuse-of-discretion standard applies, Charles Blue Br. at 13, Eagan and Doss incorrectly contend that this Court should apply a *de novo* standard to its review of the district court's sanctions because they are "based on 'allegedly unethical' conduct," citing *Schlumberger Technologies, Inc. v. Wiley*, 113 F.3d 1553 (11th Cir. 1997). *See* Eagan/Doss Blue Br. at 29–30.  But this Court held in *Schlumberger* that where, as here, an attorney's disqualification is based on conduct that "threaten[s] the orderly administration of justice," the reviewing court "give[s] great deference to a trial court's decision." 113 F.3d at 1562.

In applying the abuse-of-discretion standard, this Court "must affirm unless [it] find[s] that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1238 (11th Cir. 2007) (quotation omitted). The abuse-of-discretion standard "places a heavy thumb—really a thumb and a finger or two—on the district court's side of the scale." *Deepwater Horizon*, 119 F.4th at 944 (quotation omitted). When reviewing factual findings, "the abuse-of-discretion and clearly erroneous standards are indistinguishable." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401 (1990). Accordingly, an appellate court "may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance," so long as the district court's finding is "plausible in light of the entire record." *Brnovich v. Democratic Nat'l Committee*, 594 U.S. 647, 687 (2021). Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* (quotation omitted).

Whether the sanctions imposed by the district court violated due process is reviewed *de novo*. *United States v. Shaygan*, 652 F.3d 1297, 1310 (11th Cir. 2011).

34

## SUMMARY OF ARGUMENT

The district court did not abuse its discretion in imposing sanctions on Eagan and Doss for their bad-faith contrivance to disrupt the judicial-assignment procedures of two federal district courts. This Court had provided notice to lawyers through its prior decision in *In re BellSouth Corp.*, 334 F.3d 941 (11th Cir. 2003), that such a contrivance constitutes a threat to the orderly administration of justice and is subject to being sanctioned. Eagan and Doss's duty of zealous advocacy for their clients did not override their obligation to refrain from conduct that undermined the orderly administration of justice.

Contrary to Eagan and Doss's position, Rule 41(a) does not provide immunity to lawyers who interfere with a court's judicial-assignment procedures if they employ a dismissal under that rule as part of their scheme. Both the Supreme Court and this Court have made clear that the rights provided to a plaintiff under Rule 41(a) do not immunize lawyers from responsibility for misconduct based on obligations outside that rule. If Eagan and Doss's interpretation of Rule 41(a) were adopted, it would empower a lawyer to select the judge who would decide a particular controversy whenever the lawyer had multiple plaintiffs

available to assert the same claim. That would mark a radical change to the accepted understanding that a lawyer does not get to select the judge who will preside over the lawyer's case in a federal court.

Because the district court based its sanctions order on a permissible view of the evidence, the district court did not abuse its discretion in sanctioning Eagan and Doss. The district also did not abuse its discretion in disallowing expert testimony offered by Eagan and Doss concerning on how a reasonable lawyer would understand applicable law.

As for Charles, the district court did not abuse its discretion in sanctioning him for bad-faith intentional misrepresentations to the panel that was investigating his conduct. Although Charles now claims that the district court was required to apply a beyond-a-reasonable-doubt evidentiary standard in its consideration of sanctions against Charles, this Court cannot consider that alleged error because Charles invited it by urging the district court to apply the clear-and-convincing-evidence standard. In any event, the clear-and-convincing-evidence standard is the correct standard.

The district court based its sanctions order against Charles on findings that represented a permissible view of the evidence. Thus, the district court did not abuse its discretion.

Finally, the due-process objections raised by Eagan, Doss, and Charles are meritless. The due-process requirements did not attach during the investigatory proceedings, but only after the district court issued its show-cause orders. Due process required that the respondents have notice and an opportunity to be heard, both of which they received. And even if there were any due-process shortcomings in the proceedings before the investigatory panel, they provide no basis to disturb the district court's sanctions order. The district court made its own independent determinations, and the district court cured any alleged problems with the panel's proceedings.

37

## ARGUMENT

## I. The district court had authority to sanction Eagan, Doss, and Charles for their misconduct.

The district court had authority to impose sanctions on Eagan, Doss, and Charles for their misconduct.

### A. A district court possesses inherent authority to sanction lawyers for bad-faith conduct that undermines the orderly administration of justice.

"Courts possess the inherent power to protect the orderly administration of justice" by "impos[ing] reasonable and appropriate sanctions upon errant lawyers practicing before [them].'" *Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985) (quoting *Flaksa v. Little River Constr. Co.,* 389 F.2d 885, 888 (5th Cir.1968)).  As the Supreme Court has explained, "[i]t has long been understood that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *United States v. Hudson*, 7 Cranch 32, 34 (1812)) (alteration adopted).

A court's inherent authority includes the power to "discipline attorneys who appear before it" and "the ability to fashion an appropriate

sanction for conduct which abuses the judicial process." *Id.* at 43, 44–45. The sanctions a court may impose under its inherent authority extend to those as severe as "outright dismissal of a lawsuit" in addition to "less severe" sanctions. *Id.* at 45 (quotation omitted). This Court has likewise held that district courts have a corresponding "inherent power to investigate" conduct they "deem[] to threaten the integrity of the court." *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1314 (11th Cir. 2021).

To impose sanctions under its inherent powers, a court "must find that the lawyer's conduct 'constituted or was tantamount to bad faith.'" *Thomas v. Tenneco Packaging Co.*, 293 F.3d 1306, 1320 (11th Cir. 2002) (quoting *Durrett v. Jenkins Brickyard, Inc.,* 678 F.2d 911, 918 (11th Cir. 1982)). A court must "make specific findings about which conduct justifies sanctions." *J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F.4th 1340, 1346 (11th Cir. 2024).

While a lawyer's bad faith must be "intentional" or "subjective" to support sanctions based on the court's inherent authority, "that intent can be inferred 'if an attorney's conduct is so egregious that it could only be committed in bad faith.'" *J.C. Penney Corp.*, 100 F.4th at 1346 (quoting *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218,

39

1224–25 (11th Cir. 2017)). Notably, a "determination of a lawyer's bad faith is particularly sensitive to demeanor and other intangible cues often not reflected in a transcript." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1250 (11th Cir. 2007).

This Court has yet to decide "whether district courts should use a preponderance standard or a clear-and-convincing standard" when imposing inherent-power sanctions. *J.C. Penney Corp.*, 100 F.4th at 1347 n.2. (The district court applied the clear-and-convincing standard here.) But under either standard a court need not "rule out all other 'plausible' explanations'" before finding bad faith." *Id.* at 1347.

## B.　Judge Burke had authority to serve by designation in this case in the Middle District of Alabama.

Although no party raised any question below about the propriety of Judge Burke presiding in this case in the Middle District of Alabama, the amici make an out-of-left-field argument in their brief that his service was improper and that he thus could not properly enter the sanctions order. The amici's argument is demonstrably false.

After the *Eknes-Tucker* action was assigned to Judge Huffaker, Judge Huffaker reassigned it to Judge Burke. Doc. 3. In ordering the reassignment, Judge Huffaker expressly relied on an "order of the Chief

40

Judge of the United States Court of Appeals for the Eleventh Circuit"
that "all United States District Judges in the State of Alabama may
preside over cases in any of the State's three federal judicial districts."
*Id.*

The amici base their lack-of-authority argument on the remarkable
assertion that they could not find any such order designating Judge
Burke to serve in the Middle District, thus calling into question the
veracity of Judge Huffaker's statement about the order. Amici Br. at 6.
The amici should have been more diligent in their search for the order.
In fact, Chief Judge Pryor issued orders for court years 2021, 2022, 2023,
and 2024 designating Judge Burke to preside over Middle District cases.
App. Doc. 58 at 16–40. Consistent with the requirements of 28 U.S.C.
§ 295, these orders were filed with the clerks of this Court and the Middle
District and maintained in the records of those respective offices. *Id.* at
28. In light of those orders, amici's argument on this point should be
rejected.

## II.  The sanctions imposed on Eagan and Doss for interference with two courts' judicial-assignment processes should be affirmed.

This Court should affirm the sanctions imposed on Eagan and Doss for their bad-faith contrivance to interfere with the judicial-assignment processes of two federal district courts.

Although Eagan and Doss repeatedly contend in their brief that they were sanctioned for misconduct in addition to interference with two courts' judicial-assignment procedures, that is not true.  The district court expressly stated its sole basis for sanctioning Eagan:

> Under the totality of the circumstances, the Court finds by clear and convincing evidence that Eagan acted in bad faith when she dismissed *Ladinsky* and filed the materially similar *Eknes-Tucker* with new plaintiffs in another federal district court for the express and nefarious purpose of interfering with the random case-assignment procedures for the Northern and Middle Districts of Alabama and subverting the orderly administration of justice.

Doc. 711 at 134.  The district court stated the same sole basis for sanctioning Doss.  *Id.* at 141.

Eagan and Doss misconstrue the district court's detailed reasons for rejecting Doss's and Eagan's explanation for their actions as the district court having based sanctions on additional grounds.  *See id.* at 127–41.  Thus, Eagan and Doss are incorrect in claiming, for example,

42

that the district court sanctioned them "for the very act of defending their conduct" (Eagan/Doss Blue Br. at 46); sanctioned them "for their 'tactics' and 'tone' in sanctions proceedings" (*id.* at 51); "sanctioned Eagan for her testimony that the only limitations on Rule 41(a)(1)(A)(i) dismissals are those in the rule itself" (*id.* at 57); sanctioned Eagan "for declining to force a conflict" with the judge assigned to the case she filed in the Middle District (*id.* at 65-66); and sanctioned Eagan and Doss "based on the court's perception that the[ir] apologies were not sincere" (*id.* at 70). The district court's actual and limited basis for sanctions against Eagan and Doss—interference with two courts' judicial-assignment processes—is clear and does not include any of those other grounds.

### A.  Interference with a court's judicial-assignment process undermines the orderly administration of justice.

Interference with a court's judicial-assignment process is a practice that is "'subject to universal condemnation.'" *See In re BellSouth Corp.*, 334 F.3d 941, 958 (11th Cir. 2003) (quoting *United States v. Phillips*, 59 F.Supp.2d 1178, 1180 (D. Utah 1999)).

This Court has held unequivocally that "a contrivance to interfere with the judicial assignment process constitutes a threat to the orderly administration of justice." *Id.* at 959. Indeed, "[e]very court considering

43

attempts to manipulate the random assignment of judges has considered it to constitute a disruption of the orderly administration of justice." *Id.* (collecting cases). "[P]ermitting such manipulation would bring 'the judicial system itself into disrepute' and 'would permit unscrupulous litigants and lawyers to thwart our system of judicial administration.'" *Id.* at 959–60 (quoting *McCuin v. Tx. Power & Light Co.*, 714 F.2d 1255, 1265 (5th Cir. 1983)). This type of manipulation "'is prejudicial to the administration of justice, because it is an undue interference with the proper assignment of cases.'" *Id.* at 960 (quoting *Grievance Adm'r v. Fried*, 570 N.W.2d 262, 267 (Mich. 1997)). And because "'judge-shopping doubtless disrupts the proper functioning of the judicial system,'" it "'may be disciplined.'" *Id.* (quoting *Standing Comm. on Discipline v. Yagman*, 55 F.3d 1430, 1443 (9th Cir. 1995)) (alteration adopted).[5]

---

[5] The amici improperly conflate the bad-faith interference with judicial-assignment procedures that occurred here with other situations where they claim assignment of cases is not random. Amici Br. at 18–23. For example, they point to situations where a plaintiff files a case in a judicial division in which only one federal judge is assigned cases. *Id.* at 19–20. But when Eagan and Doss made similar arguments, the district court correctly explained that even if the judicial system permits litigants in our federal system to choose a forum in which to initiate litigation over a controversy, that is quite different from "manipulations of the court's random case-assignment procedures" once litigation is underway. Doc. 711 at 100–01 & n.28.

**B.    Eagan and Doss had advance notice that a scheme to evade the judicial-assignment process was sanctionable misconduct.**

Based on this Court's holding in *BellSouth*, Eagan and Doss had advance notice that a scheme to evade the judicial-assignment process constitutes sanctionable misconduct.

As the district court acknowledged, in order for sanctions to be imposed on a lawyer for misconduct, a lawyer must "be 'deemed to have been on notice that the courts would condemn the conduct for which he was sanctioned.'"  Doc. 711 at 185 (quoting *In re Finkelstein*, 901 F.2d 1560, 1564 (11th Cir. 1990)).  Such notice may be "provided by ***case law***, applicable court rules, and the lore of the profession, as embodied in the codes of professional conduct."  *Finkelstein*, 901 F.2d at 1564–65 (emphasis added; internal quotations omitted).  In disciplining a lawyer, a court cannot rely on a "transcendental code of conduct . . . that . . . existed only in the subjective opinion of the court, of which the [lawyer] had no notice."  *Id.* at 1565.

The case law contained in *BellSouth* provided the requisite advance notice to Eagan and Doss.  This Court was unambiguous in *BellSouth*: "a contrivance to interfere with the judicial assignment process constitutes

45

a threat to the orderly administration of justice." 334 F.3d at 959. The district court sanctioned Eagan and Doss for just such a contrivance—"bad-faith attempts to manipulate the court's random case-assignment procedures and avoid their properly assigned judge." Doc. 711 at 171. In short, the holding in *BellSouth* put Eagan and Doss on notice that their conduct was sanctionable.[6]

In an effort to dodge the notice provided to them by *BellSouth*, Eagan and Doss urge a reading of *BellSouth* at a level of granularity that cannot be squared with our precedent-based system of justice. Because the contrivance at issue in *BellSouth* involved a scheme to force recusal of a judge through employment of the judge's nephew as counsel, Eagan and Doss suggest that the rule in *BellSouth* should be limited to cases arising out of the judicial recusal statute. Eagan/Doss Blue Br. at 53–54. But this Court has rejected such a miserly reading of its precedents. As this Court has explained, "[i]f [a court] treated every factual distinction

---

[6] In asserting that "[n]o law prohibits the conduct" for which Eagan and Doss were sanctioned, Amici Br. at 20, the amici ignore this Court's clear holding in *BellSouth*, which was based on the Court's inherent authority, not on a particular statute or rule. In light of that notice, the amici's half-baked argument that Fed. R. Civ. P. 83(b) "prohibit[ed] the sanction" due to a lack of notice is meritless. *See* Amici Br. at 16–17.

with a precedential decision as necessarily material, the doctrine of precedent would lose most of its function." *Sosa v. Martin Cnty., Fla.*, 57 F.4th 1297, 1301 (11th Cir. 2023). Consequently, in this Circuit, a court must "'follow the reasoning behind a prior holding if [it] cannot distinguish the facts or law of the case under consideration—even if the present case does not involve precisely the same issue.'" *Sabal Trail Transmission, LLC v. 18.27 Acres of Land*, 59 F.4th 1158, 1164 (11th Cir. 2023) (quoting *Devengoechea v. Bolivarian Republic of Venez.*, 889 F.3d 1213, 1227 (11th Cir. 2018)).

While Eagan and Doss emphasize that *BellSouth* did not involve a Rule 41(a) dismissal or new plaintiffs filing in a new district (Eagan/Doss Blue Br. at 54–55), they offer no credible explanation why those differences would have mattered to the outcome in *BellSouth*. In other words, they fail to offer a principled reason why the rule in *BellSouth* should be limited to cases involving the judicial-recusal statute. After all, any contrivance to interfere with the judicial-assignment process undermines the orderly administration of justice, regardless of which tools the scheming lawyers employ to carry it out. And indeed, if the Court adopted Eagan and Doss's view of notice, a creative attorney could

avoid sanctions by simply coming up with new ways to interfere with the judicial-assignment process and then claiming that there was no notice that the specific method of contrivance was impermissible under *BellSouth*.

Eagan and Doss attempt to swat away this Court's core no-contrivance-to-interfere-with-the judicial-assignment-process holding in *BellSouth* by describing it as "a stray statement" made only because the relevant recusal standard required it. Eagan/Doss Blue Br. at 54–55. Those assertions defy reality. No fair reading of the *BellSouth* Court's discussion of interference with a court's judicial-assignment process could conclude the *BellSouth* rule was limited to the recusal context or driven by the recusal standard. *See BellSouth*, 334 F.3d at 959–60. To the contrary, the *BellSouth* decision is grounded on the broad premise that litigants and lawyers "have a duty to disavow and avoid manipulations of the random assignment system," not a narrower prohibition on forcing recusal. *Id.* at 958.

Eagan and Doss also miss the mark with their argument based on this Court's ruling in *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553 (11th Cir. 1997). Eagan and Doss contend that *Schlumberger* required

48

the district court to point to a specific rule of professional conduct in order to sanction them for interference with two courts' judicial-assignment processes. Eagan/Doss Blue Br. at 51–53. But Eagan and Doss fail to mention that this Court rejected that same argument in *BellSouth*. The *BellSouth* Court held that the *Schlumberger* requirement for identification of a specific rule of professional conduct that the attorney violated does not apply "where the conduct at issue threatens the orderly administration of justice." 334 F.3d at 959. And the *BellSouth* Court construed sanctions for interference with judicial assignments as falling within a court's inherent authority to address threats to the orderly administration of justice. *Id.* at 959–60.

Finally, in order for Eagan and Doss to argue that they "were sanctioned pursuant to a 'transcendental code of conduct' . . . that 'existed only in the subjective opinion of the court' and the three-judge panel," Eagan/Doss Blue Br. at 50–51 (quoting *Finkelstein*, 901 F.2d at 1565), they have to ignore the clear explanation of the district court's basis for its ruling. Far from relying on a new rule made up on the spot, the district court based its ruling on this Court's clear statement of the law in *BellSouth*. Doc. 711 at 171–79. This Court in *Finkelstein* drew a sharp

distinction between controlling case law, such as *BellSouth*, and a standardless code of conduct concocted by the sanctioning court. 901 F.2d at 1564–65. The district court can hardly be faulted for hewing closely to this Court's direction to base a sanctions ruling on specific legal guidance, such as case law.

### C. Rule 41(a) does not provide immunity to Eagan and Doss to interfere with a court's judicial-assignment process.

Although Eagan and Doss argue that Rule 41(a) empowered them to engage in their scheme to interfere with the judicial assignment procedures of two district courts, that is not correct. Both the Supreme Court and this Court have made clear that the rights provided to a plaintiff under Rule 41(a) do not immunize lawyers from responsibility for misconduct based on obligations outside that rule. Indeed, if Eagan and Doss's argument based on Rule 41 were adopted, it would empower lawyers to select the judge to decide a controversy whenever the lawyer had multiple plaintiffs available to assert the same substantive claim. Needless to say, Rule 41(a) is not a stealth tool giving lawyers absolute authority to undermine the judicial-assignment processes of federal courts.

### 1.    Eagan and Doss were not sanctioned merely for dismissing the *Ladinsky* complaint.

As an initial matter, Eagan and Doss base their argument about Rule 41 on a false premise—that they were sanctioned solely for dismissing the *Ladinsky* action pursuant to Rule 41(a).    *See, e.g.*, Eagan/Doss Blue Br. at 38 ("[T]he sanctions were triggered only by the dismissal and functioned as a punishment for exercising a right that Rule 41 unambiguously grants").    That is not true.    If all Eagan and Doss had done was dismiss the *Ladinsky* action, it is inconceivable that they would have been sanctioned.    Indeed, the *Walker* lawyers did not file another action, and they were not sanctioned for judge-shopping.    Doc. 711 at 109–20.    Furthermore, the district court explicitly stated that the "sanctions here [we]re not imposed simply for exercising one's Rule 41 dismissal rights, but rather for the totality of [Eagan and Doss's] bad-faith conduct."    Doc. 711 at 213.    And the district court explained what the "totality of the circumstances" were that warranted sanctions—that Eagan and Doss "dismissed [the *Ladinsky* action] ***and*** refiled their case in a neighboring district with new plaintiffs, all to avoid a judge they were convinced would rule against them."    *Id*. at 209 (emphasis in original).

51

## 2. A lawyer cannot wield Rule 41(a) to engage in conduct that undermines the orderly administration of justice.

Contrary to Eagan and Doss's contention, Rule 41(a) cannot be wielded by a lawyer to undermine the orderly administration of justice, such as through interference with a court's judicial-assignment process.

Rule 41(a)(1)(A)(i) provides limited dismissal rights to a plaintiff (not the plaintiff's lawyers) by allowing the plaintiff unilaterally to dismiss an action without prejudice before an answer or summary-judgment motion has been filed. And the plaintiff can only do that once; a second such dismissal will be deemed an adjudication on the merits. Fed. R. Civ. P. 41(a)(1)(B). As the Supreme Court has explained, Rule 41(a)(1) "was designed to limit a plaintiff's ability to dismiss an action" by no longer permitting a plaintiff to dismiss up to the point of entry of a verdict. *Cooter & Gell*, 496 U.S. at 397. Under Rule 41(a)(1), a plaintiff is allowed to "dismiss an action without the permission of the adverse party or the court only during the brief period before the defendant had made a significant commitment of time and money." *Id.* "Rule 41(a)(1) was not designed to give a plaintiff any benefit other than the right to take one such dismissal without prejudice." *Id.*

52

The Supreme Court has made clear that a Rule 41 dismissal does not empower a lawyer to engage in "a separate abuse of the judicial system." *Id.* at 398. In *Cooter & Gell*, for example, the Court held that a lawyer could still be sanctioned for a Rule 11 violation that occurred prior to a Rule 41(a)(1) dismissal. *Id.* at 395. And a sanction imposed for an abuse of the judicial system must be considered separately from the plaintiff's rights under Rule 41(a)(1). Thus, the Court explained in the Rule 11 context that "even if the Rule 11 sanction imposed by the court were a prohibition against refiling the complaint (assuming that would be an appropriate sanction for Rule 11 purposes), the preclusion of refiling would be neither a consequence of the dismissal (which was without prejudice) nor a term or condition placed upon the dismissal (which was unconditional)." *Id.* at 396–97 (internal quotations omitted). In other words, Rule 41(a)(1) does not provide immunity against a lawyer's actions that abuse the judicial process, and sanctions can be imposed even if they are inconsistent with the standard effects of a Rule 41(a)(1) dismissal.

In line with these Supreme Court holdings, this Court has emphasized that "an enterprising plaintiff [cannot] abuse the judicial

53

system but nevertheless get off scot free by voluntarily dismissing its case under Rule 41(a)(1)(A)(i)." *Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1266 (11th Cir. 2021). This is because courts must have "'the power to enforce compliance with the rules and standards that keep the judiciary running smoothly.'" *Id.* (quoting *Hyde v. Irish*, 962 F.3d 1306, 1309 (11th Cir. 2020)). Thus, "a lawyer cannot absolve himself of responsibility [for his own misconduct] by dismissing his client's suit." *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990) (quoting *Danik, Inc. v. Hartmarx Corp.*, 875 F.2d 890, 894 (D.C. Cir. 1989)). In order to ensure that a district court can police efforts to undermine the orderly administration of justice, a district court has authority for "the post-voluntary-dismissal imposition of sanctions." *Absolute Activist*, 998 F.3d at 1265.[7]

While Eagan and Doss emphasize the old Fifth Circuit's admonition that "Rule 41(a)(1) means precisely what it says," *Pilot Freight Carriers,*

---

[7] The amici are wrong in contending that the sanctions imposed on Eagan and Doss "add[] a caveat to Rule 41(a)'s dismissal procedures." Amici Br. at 16. The amici conflate the dismissal rights of the plaintiff with the obligation of the lawyer to refrain from conduct, such as interference with judicial-assignment procedures, that underlines the orderly administration of justice.

*Inc. v. Int'l Bhd. of Teamsters*, 506 F.2d 914, 916 (5th Cir. 1975), they ignore the limited nature of the relief actually accorded by Rule 41(a)(1) and to whom it is accorded.[8]  The *Ladinsky* plaintiffs received the full measure of rights to which they were entitled as a result of their Rule 41(a)(1) dismissal—the *Ladinsky* action was dismissed without prejudice.  And the *Ladinsky* plaintiffs suffered no sanction as a result of their dismissal.  Rule 41(a)(1), however, afforded no right to Eagan and Doss to interfere with two courts' judicial-assignment processes in contravention of *BellSouth*.

At least one other circuit has approved the sanctioning of lawyers when a scheme to interfere with judicial assignments includes a Rule 41(a) dismissal.  *In re Fieger*, 191 F.3d 451, 1999 WL 717991, at *1 (6th Cir. 1999) (lawyer sanctioned after filing 13 complaints "challenging the constitutionality of the same provisions of Michigan common law" and dismissing all but the one assigned to the desired judge).

---

[8] Eagan and Doss acknowledge that "*Pilot Freight* said nothing about prohibiting judge-shopping by . . . means [other than Rule 41]." Eagan/Doss Blue Br. at 39.  This Court's cases such as *Absolute Activist* and *BellSouth* make clear that district courts, in fact, have inherent authority, outside any provision in Rule 41(a), to police lawyers' efforts to undermine the orderly administration of justice such as interference with judicial-assignment processes.  *See supra* at 38–40, 43–44, 53–54.

Although Eagan and Doss cite cases from other circuits in their brief, none of them are on point and, of course, they are not controlling in any event. As an initial matter, each of the cases on which they rely are distinguishable because they involve a second action brought by <u>the same plaintiffs</u> after dismissing the first action pursuant to Rule 41(a). *See, e.g.*, Eagan/Doss Blue Br. at 41–45 (citing *Bechuck v. Home Depot U.S.A., Inc.*, 814 F.3d 287, 290-91 (5th Cir. 2016) (limitation on where plaintiff could file second action); *Adams v. USAA Cas. Ins. Co.*, 863 F.3d 1069, 1073–74 (8th Cir. 2017) (second action filed by same plaintiffs); *Wolters Kluwer Fin. Servs. Inc. v. Scivantage*, 564 F.3d 110, 112 (2d Cir. 2009) (second action filed by same plaintiffs)).[9] Having the same plaintiffs file the second action introduces a different consideration.[10] To be sure, as described above, controlling decisions from the Supreme Court and this

---

[9] These cases are not new. Eagan and Doss included them in their arguments to the district court, and the district court discussed them in detail in its sanctions order. Doc. 711 at 203–14.

[10] Eagan and Doss apparently agree that whether the same plaintiffs brought the second action is a material difference from the facts here. The district court cited in its order the decision in *Vaqueria Tres Monjitas, Inc. v. Rivera Cubano*, 341 F. Supp. 2d 69 (D.P.R. 2004). In that case, the court sanctioned lawyers after they dismissed an action under Rule 41(a) and filed a second action in an effort at judge-shopping. *Id.* at 69, 73. Eagan and Doss argued in their brief that the *Vaqueria* case was "inapposite" because "the same plaintiffs refiled the exact same case." Eagan/Doss Blue Br. at 41.

Court preclude an argument that Rule 41(a) conveys an absolute right on an attorney to interfere with a court's judicial-assignment process. But the filing of a new action by the same plaintiff is a distinguishing fact from the situation confronted by the district court. Critically, the "totality of the circumstances" on which the district court relied in sanctioning Eagan and Doss included Eagan and Doss's use of different plaintiffs to mask the judge-shopping. Doc. 711 at 133–34, 140–41.

There are numerous other reasons why the cases cited by Eagan and Doss do not support their argument:

- Contrary to Eagan and Doss's suggestion (Eagan/Doss Blue Br. at 41), the Ninth Circuit's three-paragraph opinion in *Fields v. Gates*, 233 F.3d 1174 (9th Cir. 2000), did not address whether a court can ever employ inherent-power sanctions for an attorney's alleged judge-shopping involving a Rule 41(a)(1)(A) dismissal. Indeed, the *Fields* court approvingly cited *Hernandez v. City of El Monte*, 138 F.3d 393 (9th Cir. 1998), which held that a "district court's inherent power to impose dismissal or other appropriate sanctions . . . must

include the authority to dismiss a case for judge-shopping," *id*. at 399.

- While Eagan and Doss point to the Fifth Circuit's decision in *Bechuck*, they fail to mention that the *Bechuck* court cited with approval the earlier Fifth Circuit decision in *Int'l Driver Training Inc. v. J-BRJD Inc.*, 202 Fed. Appx. 714 (5th Cir. 2006). In that case, the Fifth Circuit held that "[a]lthough rule 41(a)(1) guarantees [a plaintiff] an unconditional dismissal, it does not confer on [that plaintiff] the right to manipulate the designation of a judge." *Id.* at 716.

- The Second Circuit's decision in *Wolters* stems from its application of a different standard of review for inherent-power sanctions than this Court applies. While this Court applies an abuse-of-discretion standard, the Second Circuit applies a standard that is "more exacting than under the ordinary abuse-of-discretion standard." 564 F.3d at 113–14 (quotation omitted). Furthermore, the outcome in *Wolters* turned heavily on the fact that an inherent-power sanction was not justified because, unlike here, the district court made

58

no finding of bad faith. *Id.* at 114. And, in a later decision arising out of the same case, the Second Circuit noted that "there were legitimate reasons supporting dismissal" in *Wolters* because the attorneys "had become aware of a possible lack of jurisdiction" in the first forum. *See In re Peters*, 642 F.3d 381, 397 (2d Cir. 2011). In this case by contrast, the district court found no corresponding good-faith basis for the actions taken by Eagan and Doss. Doc. 711 at 213.

- The Eighth Circuit's decision in *Adams* is also inapposite. First, the dismissal at issue was one stipulated to by all parties under Rule 41(a)(1)(A)(ii) in conjunction with a settlement, not a unilateral dismissal by the plaintiffs under Rule 41(a)(1)(A)(i). *Adams*, 863 F.3d at 1073–74. Second, the lawyers there had originally filed the first case in state court and then, after that case was removed to federal court, filed the second case in state court. The Eighth Circuit noted its prior holding that "a federal court should not 'forbid a citizen to resort to the courts of her own state' given that 'one court

is as good as another.'" *Id.* at 1081 n.12 (quoting *Kern v. TXO Prod. Corp.*, 738 F.2d 968, 973 (8th Cir. 1984)) (alteration adopted).

In sum, Rule 41(a) does not override the prohibition on a lawyer engaging in a contrivance to disrupt the judicial-assignment processes of federal courts.

### 3. Eagan and Doss's interpretation of Rule 41(a) would permit an attorney to select the judge to determine a legal controversy where multiple plaintiffs could assert the same claim.

Adoption of Eagan and Doss's interpretation of Rule 41(a) would mark a sea change in the fundamental understanding of how judges are assigned to decide cases in federal courts. Currently, "[i]n federal court, the parties clearly have no right to a judge of their choice." *McCuin*, 714 F.2d at 1262 (quotation omitted). But Eagan and Doss insist that is not true, at least in certain circumstances. When a lawyer has available multiple plaintiffs to file different actions raising the same substantive legal issue, Eagan and Doss suggest that Rule 41(a) empowers that lawyer to select the judge to decide a legal controversy through the use of Rule 41(a) dismissals to ditch any judge but the chosen one.

60

The district court engaged in a lengthy colloquy with Eagan testing the limits of Eagan and Doss's position that Rule 41(a) affords absolute immunity to lawyers from any sanction for judge-shopping.  While a portion of that exchange is excerpted below, this Court may wish to review it in its entirety to understand the radical nature of Eagan and Doss's position. *See* Doc. 642 at 119:7–127:4.

Two of the hypotheticals posed by the district court and Eagan's responses to them highlight the grave consequences that Eagan and Doss's rule would bring about:

> THE COURT: All right. Let's say I'm challenging Alabama law that affects a huge class of people. I want a certain judge. I file in the Northern District of Alabama, where there are usually eight judges. I file 12 different cases with 12 different sets of plaintiffs. I still don't get Judge Burke, and he's who I really wanted. So I dismiss all 12. Refile all 12. This time, one of them hits, and I get Judge Burke. I dismiss all the rest of them. Do you think Rule 41 protects that conduct?
>
> . . .
>
> MS. EAGAN: Judge, I think under the current state of law on Rule 41, that that would be considered permissible based upon my read of the rule.
>
> . . .
>
> THE COURT: So is it your contention that a Rule 41 dismissal completely covers misconduct; in other words, even if you're doing it for an improper -- even if you're dismissing and refiling for an improper purpose that would otherwise be

misconduct, Rule 41 is the balm that heals it, nobody can look behind the dismissal?

MS. EAGAN: Judge, my understanding of the law is that Rule 41, you can dismiss for any purpose. If you can dismiss for any purpose, I'm not sure how there is an improper purpose.

. . .

THE COURT: Well, let me walk you through a scenario. You file a case in the Northern District. You wind up before Judge Burke on a transfer. You don't want to be before Judge Burke. You dismiss and go to the Middle District, but you get new plaintiffs. You get Judge Burke again. You dismiss again. You refile with new plaintiffs in the Middle District. You get Judge Burke again. You dismiss. You refile with new plaintiffs in the Middle District. You dismiss. You get Judge Burke again. You do this 20 times until Judge Burke says, golly, I am just going to drive back to Huntsville. And you get Judge Thompson. And then you go forward. Does Rule 41 protect that?

MS. EAGAN: I'm not aware of a prohibition against that in Rule 41.

THE COURT: Is that misconduct?

MS. EAGAN: I am not aware of a rule that would prohibit that based upon my current scope of knowledge of the law.

. . .

THE COURT: Okay. Well, tell me what the difference is between the attorney who files in one district, dismisses, refiles in another district, and stops there, and then the attorney who does it one more time, and then the attorney who does it one more time, and then the attorney who does it 20 times? Where is the line between 2 and 20 until it becomes so distasteful and wrong that you can't live with it?

MS. EAGAN: Judge, I don't know where I would draw the line. And, again, I mean, I'm not saying there's anything sanctionable or ethically wrong with it, but I just said that I would find it distasteful.

. . .

THE COURT: Wouldn't that just be the end of our system of justice as we know it if an attorney could literally just go get new plaintiffs and refile, and he didn't get the judge he wanted, and literally an unlimited number of times he just dismissed, got new parties, and refiled? What if every attorney did that in a case that affected, you know, a class of people? What would be the practical effect of that?

. . .

MS. EAGAN: In my mind, if that type of situation was happening in a jurisdiction, that the court would likely have some local rule or something to address it as many jurisdictions have.

THE COURT: Well, if Rule 41 allows it, can -- and Rule 41's an absolute bar and protection for the attorney -- can we establish a local rule that overturns Rule 41?

MS. EAGAN: I don't believe that you can.

Doc. 642 at 120:19–127:4.

Another hypothetical posed by the district court to Eagan underscores the breathtaking consequences of Eagan and Doss's position on the meaning of Rule 41(a). According to Eagan, a lawyer has an absolute entitlement to act with racist motives in judge-shopping through use of Rule 41(a)(1) dismissals:

63

THE COURT: All right. Let me give you a hypothetical. Let's say that there is a white attorney who handles lots of plaintiffs' cases, files 20 or 30 plaintiffs' cases a year. He's in a jurisdiction with a white male judge and a black female judge. Every single time he files a case and he draws the black female judge, he dismisses under Rule 41, refiles, and draws the white male over a period of years, so that he never, ever has to allow -- is in front of the black female judge, only the white male judge. Do you believe that's misconduct?

MS. EAGAN: Your Honor, under your scenario, he files a case once, he voluntarily dismisses, and he files the case one other time.

THE COURT: Yes.

MS. EAGAN: My interpretation of Rule 41 is that unless there is something unique to that jurisdiction, a local rule, that that would not be impermissible under the rules.

THE COURT: Over 30 years, every case he files, when he draws the black female judge, he dismisses and refiles and gets the white male judge. You think that's okay?

MS. EAGAN: Judge, under Rule 41, in the plain language of Rule 41 and the precedent here in the Eleventh Circuit, I believe that that is permitted.

THE COURT: Don't you think that conduct is horrific?

MS. EAGAN: Judge, I don't think that it is good – it may be considered by some to be distasteful, but, Your Honor --

THE COURT: Considered by some -- I'm sorry. I spoke over you. Go ahead.

MS. EAGAN: But I do think that under the language of Rule 41 that that would be allowed.

Doc. 642 at 119:13–120:18.

64

As Eagan's answers to the district court's hypotheticals demonstrate, adoption of Eagan and Doss's position on the immunizing effect of a Rule 41(a)(1) dismissal would cause the abrogation of the federal courts' ironclad commitment to random judicial assignment. According to Eagan and Doss, as long as a lawyer has multiple plaintiffs to file actions seeking determination of a particular legal question, the lawyer can file and then dismiss a limitless number of complaints until the lawyer's preferred judge draws the assignment of one of the cases. In other words, Eagan and Doss contend that Rule 41(a) permits a lawyer to engage in a bad-faith contrivance to disrupt the judicial-assignment process of federal district courts, and there is nothing a district court can do about it.

Fortunately for our system, that misguided view of Rule 41(a) is not the law. While Rule 41(a) provides certain limited procedural rights to a party, the Supreme Court and this Court have already determined that the rule does not provide a license to lawyers to disrupt the orderly administration of justice. The district court properly invoked its inherent authority to sanction Eagan and Doss for their bad-faith conduct consistent with this Court's holding in *BellSouth*, and the district court

65

correctly rejected their assertion that Rule 41(a) gave them a safe harbor to engage in that misconduct.

### D. Zealous advocacy for a client does not excuse conduct that undermines the orderly administration of justice.

While Eagan and Doss justify their misconduct as required by their obligation to be zealous advocates for their clients, *see* Eagan/Doss Blue Br. at 3, they ignore that a lawyer cannot jettison the parallel obligation to act within the bounds of the law. As this Court has made clear, "[a]n attorney's duty to a client can never outweigh his or her responsibility to see that our system of justice functions smoothly." *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1546 (11th Cir. 1993). Indeed, this Court expressly rejects that idea that "the duty to advocate zealously" can justify the "neglect[] [of] the corresponding duty to advocate within the bounds of the law." *Id.* at 1546–47. This Court has lamented that "[t]oo many attorneys . . . have allowed the objectives of the client to override their ancient duties as officers of the court. In short, they have sold out to the client." *Id.* at 1547.

The Supreme Court too has noted that "all attorneys must remain aware of the principle that zealous advocacy does not displace their obligations as officers of the court," *Azar v. Garza*, 584 U.S. 726, 730

66

(2018) (per curiam), and that "an attorney's ethical duty to advance the interests of his client is limited by an equally solemn duty to comply with the law and standards of professional conduct." *Nix v. Whiteside*, 475 U.S. 157, 168 (1986).

Even if Eagan and Doss assessed that evading the assignment of the *Ladinsky* and *Walker* cases to Judge Burke was of great importance to the success of their clients' position, they could not ignore the prohibition on interference with a court's judicial-assignment procedures to achieve that result, regardless of any duty to be zealous advocates.

### E.    The district court's factual findings pertaining to Eagan and Doss in the sanctions order did not involve an abuse of discretion.

The district court committed no abuse of discretion in finding that Eagan and Doss engaged in bad-faith interference with two courts' judicial-assignment procedures. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Brnovich*, 594 U.S. at 687 (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). Under the "clear error" standard, therefore, "an appellate court may not reverse even if it is convinced that it would have weighed the evidence differently in the first instance." *Id.*

67

As the factfinder in the sanctions proceedings, the district court had the opportunity to observe the witnesses and assess their credibility. Contrary to Eagan and Doss's remarkable contention, the district court did not engage in "[p]resumptive disbelief" of Eagan and Doss's evidence. Eagan/Doss Blue Br. at 69. The district court's detailed order demonstrates otherwise. In fact, the district court made a garden-variety determination of facts based on the evidence presented—including Eagan's and Doss's testimony, about which the district court had to make ordinary credibility determinations.[11] *See* Doc. 711 at 127–41.

Without citation to any legal authority, Eagan and Doss argue that the district court was required to accept "consistent testimony from multiple lawyers that the decision to dismiss was based on several legitimate factors." Eagan/Doss Blue Br. at 58. But, if true, that would unduly stunt the authority of a district court to assess the credibility of

---

[11] Contrary to Eagan and Doss's contention, the district court had no obligation to construe the evidence in the light most favorable to them. *See* Eagan/Doss Blue Br. at 68 (citing *Gust, Inc. v. Alphcap Ventures, LLC*, 905 F.3d 1321, 1327 (Fed. Cir. 2018)). First, there is no such rule in this Circuit. Furthermore, *Gust*, a Federal Circuit decision, is inapposite because the court there was applying a less deferential standard of review for sanctions, not the abuse-of-discretion standard applied in this Circuit. *See* 905 F.3d at 1327. In addition, *Gust* did not purport to create a rule concerning construction of evidence. *Id.*

witnesses.  In this case, the district court gave detailed explanations why the other members of the *Ladinsky* legal team did not need to be sanctioned.  Doc. 711 at 120–27.  As a result, the district court found no need to make further findings as to those lawyers, including determinations concerning the credibility of their testimony about why *Ladinsky* was dismissed and *Eknes-Tucker* was filed.  *Id.*  But that does not mean that the district court committed clear error in finding Eagan and Doss's explanations as not credible, even if their explanations were consistent with testimony of other lawyers.

Critically, Eagan and Doss concede in their appellate brief that one of the motivating reasons for their conduct was "concern about Judge Burke."  *See* Eagan/Doss Blue Br. at 58.  Eagan and Doss were clear on how they perceived their chances of success in front of Judge Burke— "[s]lim" to "little chance." Doc. 642 at 90:11–22.  The other *Ladinsky* attorneys who relied on Eagan and Doss's local knowledge came away with the same view after hearing from them.  *See*, *e.g.*, Doc. 640 at 42:5–6 ("I certainly had the impression that . . . the prospects of success were slim to none."); Doc. 636 at 15:4–17 ("I certainly walked away from that phone call with the impression that the view of Ms. Eagan was that it

was unlikely, perhaps very unlikely that a preliminary injunction would be granted.").

Eagan and Doss's acknowledgement that an aversion to Judge Burke as the assigned judge was at least one of the motivating factors in their decision making by itself supports the district court's conclusion that they acted in bad faith to disrupt the judicial-assignment processes of the two districts.

But there was much more evidence relied on by the district court that permissibly supports its findings. *See* Doc. 711 at 127–41. For example, the district court pointed to the fact that Doss and Eagan had carefully planned their litigation strategy for years so that they could react quickly if and when the Legislature passed the act in question. For more than two years, the *Ladinsky* team planned to litigate their case in the Northern District of Alabama. *Vague*, Doc. 79 at 20:3–21:13, 64:2–9; *Vague*, Doc. 80-2 at 3. And "given the Act's 30-day effective date, time was precious." *Vague*, Doc. 80-2 at 7–8. They had also won the race to the courthouse with the filing of *Ladinsky*. They planned to quickly seek preliminary injunctive relief before the act took effect. The district court explained that the sudden dismissal of the *Ladinsky* action and the delay

70

caused by the need to round up new plaintiffs and file the *Eknes-Tucker* action cannot be reconciled with this professed urgency.  *See* Doc. 711 at 127, 135–36.  A plausible explanation for the "total about-face" was the desire to obtain a different judge to decide the legal issues.  Doc. 711 at 127, 136.

Although Eagan and Doss offered various explanations for their conduct in an apparent effort to fend off a finding of bad faith, the district court plausibly rejected those explanations as not credible.  First, Eagan and Doss asserted that their conduct was motivated by a desire to obtain a randomly-assigned judge following the "unusual" transfer of *Ladinsky* from Judge Axon to Judge Burke, which they contend varied from established procedures.  *See*, *e.g.*, Doc. 642 at 89:13–25, 95:7–17, 134:5–15, 142:2–144:7.  Second, they claimed they were concerned about losing their first-filed status.  *Id*. at 89:13–90:10, 90:24–92:12, 134:5–15, 136:6–138:17.  Third, they claimed that they were acting on their understanding of what Rule 41 permitted.  *Id*. at 119:7–127:4.  The district court did not commit clear error in rejecting those explanations.

**1.    The district court permissibly rejected Eagan and Doss's contention that they merely wanted to ensure that they would have a randomly-assigned judge preside over their case.**

The district court had a plausible basis to reject Eagan and Doss's suggestion that process concerns following the transfer of the *Ladinsky* case to Judge Burke motivated their conduct. Specifically, Eagan and Doss both claim that the dismissal of *Ladinsky* was in part "fueled" by "concerns about *judicial* variance from the random case assignment procedures." Eagan/Doss Blue Br. at 58 (emphasis in original). They say that *Ladinsky* was transferred contrary to the Northern District's procedures. Doc. 642 at 99:7–18, 142:14–22; *Vague*, Doc. 78 at 74:24–75:6; *Vague*, Doc. 80-2 at 7–8. As a legal matter, Eagan and Doss are wrong that the transfer was somehow improper or unusual. But in any event, the district court's finding that the "unusual transfer" justification was not credible is a permissible view of the evidence.

**a.    There was nothing improper about Judge Axon's transfer of *Ladinsky* to Judge Burke.**

To start, there was nothing improper about Judge Axon's transfer of *Ladinsky* to Judge Burke.

72

It is well-settled in this Circuit that "District Judges have the inherent power to transfer cases from one to another for the expeditious administration of justice." *United States v. Stone*, 411 F.2d 597, 599 (5th Cir. 1969); *accord United States v. McCullough*, 851 F.3d 1194, 1199–1200 (11th Cir. 2017); *Williams v. Ala. Bd. of Educ.*, 182 Fed. Appx. 868, 871 (11th Cir. 2006); *Norman v. Montgomery Bd. of Educ.*, 177 Fed. Appx. 939, 941 (11th Cir. 2006). Judges thus "may by rule, order or consent transfer cases between themselves." *Stone*, 411 F.2d at 598.

That is what occurred here. Judge Axon transferred *Ladinsky* to Judge Burke "[i]n the interest of efficiency and judicial economy." *Ladinsky,* Doc. 14. There was nothing improper about the transfer. Nor should such a transfer have come as a surprise given this Court's settled law. Simply put, Eagan and Doss were on notice that controlling Circuit precedent expressly permitted such a transfer.

### b. The district court's finding that Doss and Eagan were not motivated by a desire to obtain a randomly-assigned judge is a permissible view of the evidence.

The district court rejected Eagan and Doss's contention that they had a concern about what they perceived to be an irregular transfer of *Ladinsky* from Judge Axon to Judge Burke and simply wanted to obtain

73

a randomly-assigned judge to preside over their case. The district court's conclusion reflects a permissible view of the evidence.

*First*, the district court had before it testimony that undercut the purported concern about an irregular transfer process. When pressed for a reason how the purportedly "unusual transfer" process could harm their case, Doss and Eagan offered little in response. Doss testified that lawyers are just "creatures of habit" that "like rules" and when they "perceive that [they] are not experiencing" the rules, "it makes [lawyers] uneasy." Doc. 642 at 143:4–144:7. And Eagan testified that given "the nature of the case," she felt like they "needed an explanation" for "why the practice in the Northern District was not followed in this particular case" and she "had no good way to figure out why." Doc. 642 at 98:1–99:18.[12]

---

[12] While Eagan and Doss criticize the district court for referring to testimony from another member of the *Ladinsky* legal team about how the team would have reacted if the roles between Judge Axon and Judge Burke had been reversed (Eagan/Doss Blue Br. at 60-61), they ignore that the district court tied that lawyer's statement to testimony given by Eagan and Doss. Doc. 711 at 133, 140. Eagan and Doss also note that the other lawyer was not sanctioned (Eagan/Doss Blue Br. at 61), but the district court explained at length why it deemed no such sanction to be necessary. Doc. 711 at 121–22.

But ultimately, Eagan and Doss's testimony permissibly supported a conclusion that it was not the manner of transfer, but instead it was Judge Burke's status as the transferee judge, that motivated their conduct. Doc. 642 at 98:25–99:10, 145:6–11. And that conclusion makes sense—the process for how a judge receives a case matters little if a party is pleased with the result. To that point, Doss conceded that if the case had been transferred to Judge Thompson in the same way it was transferred to Judge Burke, it would "make it more compelling to just keep the case, and it would override the other considerations. Someone we viewed as an extremely good draw for something like this." Doc. 642 at 140:17–20. Eagan testified that she did not know if she still would dismiss if "the unexplained transfer from Judge Axon [was] to Judge Thompson." Doc. 642 at 99:19–24. Yet within 30 to 45 minutes of the transfer to Judge Burke—and with less than 30 minutes of discussion— she was on board with dismissing *Ladinsky*. Doc. 642 at 100:7–11; *Vague*, Doc. 78 at 74:1–4, 88:21–25, 105:19–106:8.

That evidence provides a plausible basis for the district court to have discredited Eagan and Doss's alleged process concerns.

75

*Second*, that same evidence provided the district court with a plausible basis to discredit Eagan and Doss's testimony that they dismissed *Ladinsky* and refiled in the Middle District merely because they just wanted a randomly assigned judge. *Vague*, Doc. 80-1 at 11–12; *Vague*, Doc. 78 at 268:3–24. The district court had ample basis to conclude that Eagan and Doss would not have acted in the same manner if the transferee judge had been one they deemed more favorable, even if that transferee judge was not randomly assigned.

*Third*, Eagan and Doss's suggestion that they just wanted an explanation for why *Ladinsky* was transferred to Judge Burke is undermined by their unwillingness to accept the Panel's later explanation of that transfer.

Eagan testified that it was "important" to the *Ladinsky* team "to understand why our case had been treated different than other cases." *Vague*, Doc. 78 at 83:16–84:1. She "felt like" she "owed a duty" to "the clients" to "understand why the practice was not followed." Doc. 642 at 108:13–19. Yet when the Panel explained why Judge Axon transferred the case—because she was in the middle of a trial that was scheduled to

last two weeks, *Vague*, Doc. 109 at 33:10–22—Eagan and Doss pushed back.

During the show-cause proceedings, as part of an effort to bolster their purported concerns about Judge Axon's transfer of the case, Eagan and Doss filed a motion to take judicial notice of certain docket entries in the criminal case Judge Axon was handling.  Doc. 571.[13]  Eagan and Doss now argue that it is "incomprehensible how a citation to a docket embraced by the panel is misleading."  Eagan/Doss Blue Br. at 64.  But that glosses over the implication of the motion—they were implying that the explanation for the transfer was not true.  The district court found that Eagan and Doss's judicial-notice motion was misleading because the docket entries—and the specific portions of those entries they alerted the court to—do not tell the full story.  Doc. 707.

Indeed, to understand the purpose of the motion, the district court asked Eagan and Doss's counsel to walk through the documents and the purpose for which they were being offered.  Doc. 640 at 8:14–22.  Their counsel explained that the documents showed that the Panel "appear[ed] to have been confused about the status of" the criminal trial because the

---

[13] Tellingly, no other respondent joined the motion.

portions of the documents they cited showed "that the jury began deliberating in the Williamson case at 2:15 p.m. on Friday, April 15th," and "Judge Axon transferred the case [*Ladinsky*] at 4:47 p.m. on April 15th." Doc. 640 at 10:16–11:14. According to Eagan and Doss, these documents "show[ed] the actual timeline of Judge Axon's trial." *Id*. The "most critical part" of the documents, according to them, was the "2:15 p.m. entry in the Friday transcript that show[ed] the jury began its deliberations." *Id*. at 12:9–13:6. But Eagan and Doss ignored the portions of the criminal-trial record that showed that the trial was a 20-count, multi-defendant case, where Judge Axon expected there to be a separate civil-forfeiture phase after the jury deliberated on guilt. *Id*. at 15:15–22:5.

The Panel provided the explanation for the transfer because Eagan, Doss, and others were suspicious of what occurred. The explanation showed that nothing improper had occurred. The implication from the judicial-notice motion was that the opposite was true—either (1) Judge Axon was not forthright about the status of the trial when she transferred *Ladinsky*; or (2) the Panel was not forthright about the status of the trial. When asked whether they stood by the motion, Eagan testified that she

was "very comfortable with [her] attorneys' presentation," Doc. 640 at 31:18–24, and Doss stated that he was "still 100 percent comfortable with th[e] filing." *Id*. at 30:16–22. The district court permissibly viewed this evidentiary gambit by Eagan and Doss as undermining the credibility of their contention that their actions were driven by a good-faith concern about the transfer process. Doc. 711 at 132, 139.

* * *

In sum, it was a permissible view of the evidence for the district court to find that Eagan and Doss's actions were motivated by identity of the transferee judge, not by a high-minded concern to preserve the random-assignment process.

> ### 2. The district court permissibly rejected Eagan and Doss's contention that their concern to retain first-filed status motivated their actions.

Eagan and Doss's purported fear of *Ladinsky* losing its first-filed status does not justify their actions either, and the district court had a permissible basis to find the justification unworthy of credit. Eagan and Doss argue that "*Walker*, at the time, seemed to be moving on a faster track—unlike *Ladinsky*, a temporary restraining order motion was

79

already filed in that case, and a status conference scheduled." Eagan/Doss Blue Br. at 63.

Yet that justification makes little sense given that the *Ladinsky* counsel agreed to consolidation with *Walker* just hours before Judge Axon's transfer of *Ladinsky* to Judge Burke. The *Ladinsky* and *Walker* teams were working together to draft a motion to consolidate the afternoon Eagan and Doss dismissed *Ladinsky*. *Vague*, Doc. 80-1 at 6–7; *Vague*, Doc. 77 at 47:9–23, 152:19–153:20. And shortly before they dismissed *Ladinsky*, Eagan was on the phone with the attorney for the State of Alabama consenting to the State's motion to consolidate the two cases. *Vague*, Doc. 80-1 at 7; *Vague*, Doc. 78 at 68:13–72:7. At that time, the motions for TRO and preliminary injunction in *Walker* had been pending for several days, and the *Ladinsky* team still had not filed their competing motions. Doc. 642 at 136:24–137:3.

Thus, any reason to fear that *Walker* was "inching ahead" existed when Eagan and Doss agreed to consolidation. The only change in circumstances was the judge who would handle the cases. Indeed, Doss conceded that if Judge Burke transferred *Walker* "on April the 15th to Judge Axon, and she set[] a status conference, [*Ladinsky* was] going to be

80

in the exact same place that [it] would have been with [Judge Burke]."
Doc. 642 at 136:24–137:10.

Furthermore, regardless of which judge was assigned the cases, *Ladinsky* was the first-filed case as a matter of fact. It was filed on April 8, 2022 (*Ladinsky*, Doc. 1), and *Walker* was filed on April 11, 2022 (*Walker*, Doc. 1). Dismissing only increased the chances of losing that first-filed status—when *Ladinsky* was dismissed, Eagan and Doss had no guarantee from the *Walker* legal team that they would not turn around and refile first.

In short, it was a permissible view of the evidence for the district court find that Eagan and Doss's actions were not motivated by a good-faith fear of losing the first-filed status.

### 3. The district court permissibly rejected Eagan and Doss's contention that they acted based on their understanding of what Rule 41 permitted.

Although Eagan and Doss also contended that they acted based on their understanding of what Rule 41 permitted them to do, the district court permissibly rejected that explanation as not credible. The district court simply did not believe Eagan and Doss when they claimed that the true reason they acted as they did was because they understood Rule 41

81

to allow it. *See* Doc. 711 at 133–34, 140. The district court based its conclusion on straightforward credibility determinations about their testimony. There is no basis for this Court to disturb the district court's credibility assessments on a clear-error review.

* * *

In sum, the district court concluded by clear and convincing evidence that Eagan and Doss acted in bad faith to disrupt the judicial-assignment process in two federal courts and that such conduct warranted sanctions. The district court's conclusions on these points reflected a permissible view of the evidence, so Eagan and Doss have not established the existence of clear error.[14]

## F. The district court did not abuse its discretion in disallowing expert testimony that Eagan and Doss sought to admit.

The district court did not abuse its discretion in excluding expert testimony on how a reasonable lawyer would understand applicable law. Evidentiary rulings, including those disallowing expert testimony under Rule 702, are subject to abuse-of-discretion review. *In re Deepwater*

---

[14]As explained above, *see supra* at 42–43, Eagan and Doss's contention that they were sanctioned for conduct other than bad-faith interference with judicial-assignment procedures is not accurate.

*Horizon BELO Cases*, 119 F.4th 937, 944 (11th Cir. 2024). Although Eagan and Doss cast it as a due-process issue, exclusion of the proposed expert affidavit was a garden-variety evidentiary ruling. This Court should not disturb the district court's decision that it did not need expert testimony on questions of law.

A court has no obligation to hear expert testimony on issues of law like the proper interpretation of Rule 41 or case law. *Commodores Ent. Corp. v. McClary*, 879 F.3d 1114, 1128-29 (11th Cir. 2018) ("[Q]uestions of law are not subject to expert testimony."); *United States v. F.E.B. Corp.*, 52 F.4th 916, 931-33 (11th Cir. 2022) (affirming exclusion of expert reports because the "district court did not need any assistance in finding or applying legal definitions"). After all, "careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute" and its application to the case at bar "is what courts do." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 201 (2012).

The expert declaration here offered opinions about how a "reasonable lawyer" would have understood Rule 41, *BellSouth*, and other prohibitions on judge-shopping, as well as opinions about the

purpose and effect of sanctions. Doc. 496-1 at 4–18. Because these opinions concerned interpretation of the Federal Rules of Civil Procedure and case law, the district court acted well within its discretion in determining that they would not "help the trier of fact" under Rule 702. *See* Doc. 449 at 1–3.

The cases cited by Eagan and Doss do not hold or even suggest that a court must consider an expert affidavit on the propriety of counsel's conduct before imposing sanctions. Eagan and Doss cite this Court's passing reference in *Finkelstein* to affidavits from practicing attorneys as supportive of its conclusion that the impropriety of the sanctioned attorney's conduct was debatable. *See* Eagan/Doss Blue Br. at 73. But *Finkelstein* says nothing about whether the district court was required to admit such testimony. 901 F.2d at 1565. The only other case cited by Eagan and Doss, *Thomas v. Tenneco Packaging Co., Inc.*, 293 F.3d 1306 (11th Cir. 2002), affirmed a sanctions order. In a footnote, the court mentioned the attorney's failure to present "any evidence, affidavits or otherwise . . . demonstrat[ing] that a reasonable attorney would approve of her behavior" as one of at least three reasons why *Finkelstein* was distinguishable. *Id.* at 1323 n.27. But the Court in *Thomas* did not

84

suggest that a district court would have would have been required to admit such evidence if it had been offered. Neither case supports the argument that the district court's exclusion of expert testimony here was an abuse of discretion.

* * *

Based on the foregoing, the district court did not abuse its discretion in imposing sanctions on Eagan and Doss for bad-faith interference with two courts' judicial-assignment processes. Accordingly, the sanctions should be affirmed.

## III. The sanctions imposed on Charles for making false statements under oath to the investigatory panel should be affirmed.

Charles has identified no valid ground for reversing the district court's order sanctioning him for testifying falsely to the Panel. Charles urged the district court to apply the evidentiary standard about which he now complains, and which was the correct standard in any event. In addition, Charles has not demonstrated that the district court's factual finding that Charles misled the Panel in bad faith was clearly erroneous. The sanctions against Charles should, therefore, be affirmed.

85

### A.    A lawyer who testifies falsely in bad faith undermines the orderly administration of justice.

Giving false testimony under oath in bad faith unquestionably disrupts the orderly administration of justice.    Courts' universal requirement that witnesses testify under an oath to tell "the truth, the whole truth, and nothing but the truth" underscores the centrality of honest testimony to the judicial process.    False testimony is all the more pernicious when it comes from a member of the bar who owes a duty of candor to the court.    That duty "reflects the truism that it is essential that members of the bar be trustworthy and that their statements be completely reliable."  *See Matter of Mattox*, 35 Fed. Cl. 425, 429 (1996), *aff'd sub nom., In re Mattox*, 106 F.3d 426 (Fed. Cir. 1997).    Justice Frankfurter likewise observed that a "lawyer's responsibility in our society" requires the "qualities of truth-speaking" and "of a high sense of honor," both of which are obviously incompatible with giving misleading testimony in a court proceeding.  *Schware v. Bd. of Bar Exam'rs of N.M.*, 353 U.S. 232, 247 (1957) (Frankfurter, J., concurring).    "[A]n attorney must be mindful of h[is] duty of candor to the Court in all affairs,"

including when appearing as "a litigant, not an attorney" in the case.

*Musson v. Cook Jones*, 2023 WL 7089941, *18 (S.D. Ga. Oct. 26, 2023).

## B.    The district court did not err by applying the clear-and-convincing-evidence standard.

The district court properly applied the clear-and-convincing-evidence standard when it found that Charles's false testimony before the Panel was intentionally misleading and not a mere matter of forgetfulness. Although Charles now contends that the district court should have applied a beyond-a-reasonable-doubt standard, he argued otherwise to the district court. Any error the district court committed by applying the clear-and-convincing evidence standard was therefore invited, and this Court cannot reach the question of which standard applies. Regardless, the beyond-a-reasonable-doubt standard was not required because the district court made no findings of perjury.

### 1.    Any error was invited because Charles advocated the clear-and-convincing-evidence standard that the district court applied.

Because Charles argued that the district court should apply the clear-and-convincing-evidence standard for sanctions issued under the court's inherent authority, he cannot challenge on appeal the district court's use of that standard.

"It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1293–94 (11th Cir. 2002) (quotation omitted).  The invited-error doctrine "enforces the notion, rooted in fairness, that someone who invites a court down the primrose path to error should not be heard to complain that the court accepted its invitation." *United States v. Duldulao*, 87 F.4th 1239, 1255 (11th Cir. 2023) (quotation omitted).  Applying this doctrine, this Circuit has held that where a trial court applies a legal rule or standard advocated by a party, the appellate court is "precluded from reviewing that error." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1327 (11th Cir. 2022) (quotation omitted); *accord Lanfear v. Home Depot, Inc.*, 679 F.3d 1267, 1279 n.15 (11th Cir. 2012) (invoking invited-error doctrine where district court applied "the only standard the plaintiffs put forth").

Even if Charles's argument regarding the applicable standard were correct (and it is not), this is a textbook case of invited error.  In response to the district court's show-cause order, Charles unambiguously took the position that the beyond-a-reasonable-doubt standard would apply only to sanctions imposed for violation of the criminal perjury statute, while a

clear-and-convincing-evidence standard would otherwise apply. Doc. 517 at 8–9 (arguing that "clear and convincing evidence" standard "applies to all of the charges against Mr. Charles, except for the charge of 'perjury in judicial proceedings,'" which "requires proof beyond a reasonable doubt"); *see also id.* at 23–24, 32; Doc. 518 at 6–7 (arguing that "any finding of sanctionable conduct must be supported by clear and convincing evidence"), 59–60 (similar); Doc. 460 at 10:24–11:4 (Charles' counsel arguing to the district court that "the standard is clear and convincing evidence before you can impose sanctions").[15] Charles cannot challenge on appeal the district court's application of the very standard he asked it to apply.

Because the district court did not make a perjury finding, Charles gets no traction on appeal from his argument below that the beyond-a-reasonable-doubt standard is appropriate for sanctions under the perjury statute. The district court's order left no doubt that it was sanctioning Charles only under the court's inherent authority, and the district court

---

[15] Charles made the same argument in a brief to the district court that followed the Panel's release of its final report. Doc. 370 at 19 (arguing that "proof of counsel's subjective bad faith must be established by clear and convincing evidence").

expressly disclaimed any finding of perjury. Doc. 711 at 224 ("[T]he Court has made no findings of perjury . . . ."); *id.* at 225 n.45 (declining to address Charles's "arguments against imposing sanctions under 18 U.S.C. § 1623" as moot because "the Court's sanctions don't rest on this statute").

In sum, the district court applied the clear-and-convincing-argument standard that Charles urged, so he invited the alleged error about which he now complains.[16]

### 2.    The beyond-a-reasonable-doubt standard does not apply in any event.

Even if this Court could address Charles's argument about the beyond-a-reasonable-doubt standard (and it cannot under *Carrizosa* due to the invited error), that argument would fail on the merits. Contrary to Charles's position, neither the punitive nature of a sanction nor the fact that the sanctioned conduct could separately give rise to disbarment

---

[16] On the flip side of the invited-error coin, Charles also forfeited the argument he now makes with respect to the standard of review. Charles argues on appeal that "criminal protections could still be required in sanctions proceedings if the lawyer's conduct involved behavior giving rise to disbarment or criminal censure." Charles Blue Br. at 22 (quotation omitted). But he never asserted below that the beyond-a-reasonable-doubt standard applied to anything other than sanctions based on the perjury statute. So, in addition to being invited error, this argument is also forfeited.

or criminal punishment triggers a requirement to apply the beyond-a-reasonable-doubt standard.

### a. The beyond-a-reasonable-doubt standard is not required for every punitive sanction.

Proof beyond a reasonable doubt is not required for a court to impose sanctions merely because they are punitive in nature.

*Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193 (11th Cir. 1985), and *Donaldson v. Clark*, 819 F.2d 1551 (11th Cir. 1987) are controlling on this point.  In *Kleiner*, this Court rejected the argument that punitive sanctions trigger "the right to jury trial and analogous criminal procedural rights."  751 F.2d at 1209.  And this Court reaffirmed in *Donaldson*, that *Kleiner* "explicitly rejected the argument that the punitive character of a monetary sanction imposed in a judicial disciplinary proceeding . . . requir[es] the right to jury trial and analogous criminal procedural rights."  819 F.2d at 1558.

*Donaldson* is particularly instructive.  In that case, the *en banc* Court discussed Rule 11 sanctions and noted that a "violation of Rule 11 is fundamentally different from an infraction of criminal contempt and therefore warrants different sanction proceedings."  *Id*.  In doing so, this Court recognized that "there comes a point when the benefit of an

91

additional safeguard . . . may be outweighed by the cost" and that "uniformly requir[ing] courts to follow [criminal contempt] procedures whenever they contemplate imposing a monetary sanction would create just that situation." *Id*. at 1559. Because "less extensive procedures will generally protect the individual interests involved" in non-criminal sanctions, this Court does not require a district court to provide criminal procedural protections like the beyond-a-reasonable-doubt standard any time it considers "punitive" sanctions. *See id*.

The Supreme Court's holding in *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101 (2017), does not alter that controlling analysis. In *Goodyear*, the Court limited fee-shifting sanctions to fees the prejudiced party "would not have paid but for the misconduct." *Id*. at 109 (quotation omitted). Charles emphasizes the Court's statement that shifting fees beyond those covered by a "but-for" causation test would require "procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." *Id*. at 108.[17] But "*Goodyear* had

---

[17] The *Goodyear* Court's language carefully avoids a pronouncement that extends beyond fee-shifting, confirming that the rule articulated in *Goodyear* is confined to that unique sanction. The Court stated that "*such a sanction* [*i.e.*, requiring a party "to reimburse legal fees and costs incurred by the other side"], when imposed pursuant to civil procedures,

nothing to do with 'sanctions' generally and everything to do with the specific sanction of attorney's fees." *Government Employees Ins. Co. v. Nealey*, 262 F. Supp. 3d 153, 178 (E.D. Pa. 2017); *accord Frazier v. Se. Ga. Health Sys., Inc.*, 2025 WL 2257529, *3 & n.5 (S.D. Ga. Aug. 7, 2025) (rejecting argument that *Goodyear* required reasonable-doubt standard where court dismissed case as sanction for fabricating evidence but "awarded no fees"); *see also Fuery v. City of Chicago*, 900 F.3d 450, 468–69 (7th Cir. 2018) (expressing doubt that *Goodyear* "applies to sanctions other than an award of attorneys' fees" without deciding the question).

Because the "entire *Goodyear* decision dealt with the specific sanction of attorney's fees—not dismissal or any other type of sanction," *Nealey*, 262 F. Supp. 3d at 177, this Court should not overrule its settled precedent in *Kleiner* and *Donaldson* by extending *Goodyear* beyond the fee-shifting context.

---

must be compensatory rather than punitive in nature"; that "*the fee award* may go no further than to redress the wronged party 'for losses sustained'" without "impos[ing] an additional amount as punishment"; and that when "criminal-type protections are missing, a court's *shifting of fees* is limited to reimbursing the victim." 581 U.S. at 107–08 (emphasis added).

**b.    Potential    consequences    in    separate proceedings  do  not  trigger  the  beyond-a-reasonable-doubt standard.**

The possibility that the sanctioned attorney could face additional consequences in separate proceedings likewise does not require a district court to employ the beyond-a-reasonable-doubt standard.  The district court did not disbar Charles, and it expressly made "no findings of perjury" (Doc. 711 at 224) or of any other criminal violation.  Charles nevertheless argues that because *another* court or disciplinary authority might separately impose one of those sanctions, he was entitled to the beyond-a-reasonable-doubt standard in the district-court proceedings.

To support this argument, he incorrectly invokes the court's statement in *Kleiner* that a trial court has "the inherent power to discipline counsel for misconduct, short of behavior giving rise to disbarment or criminal censure, without resort to the powers of civil or criminal contempt."  Charles Blue Br. at 21–22 (emphasis omitted) (quoting *Kleiner*, 751 F.2d at 1209).  *Kleiner*, however, merely clarified that the contempt power is not the only means by which a court can discipline the attorneys that practice before it.  The sanctioned attorneys' argument in *Kleiner* was that the sanctions proceeding required

94

"criminal procedural rights" because the imposition of a punitive fine rendered the proceeding "one of criminal contempt." *Kleiner*, 751 F.2d at 1209.

Rejecting that argument, the Court made clear that "[c]ourts possess the inherent power to protect the orderly administration of justice" and could use this inherent power "to impose reasonable and appropriate sanctions upon errant lawyers" even apart from the contempt power. *Id*. (quotation omitted). In context, therefore, the passage on which Charles relies does not suggest that the procedural protections required turn on other possible consequences the attorney could face in separate proceedings; at most, it implies that courts must "resort" to the contempt power when they themselves impose disbarment or criminal penalties.

Charles's interpretation of *Kleiner* is further belied by post-*Kleiner* case law in this Circuit that does not require the beyond-a-reasonable-doubt standard even in disbarment proceedings. For example, in *Matter of Calvo*, 88 F.3d 962 (11th Cir. 1996) (per curiam), this Court upheld a district court's reciprocal disbarment of an attorney based on his disbarment by a state bar, explaining that in such circumstances, the

district court "must determine whether the record underlying the predicate state disbarment reveals the kind of infirmities identified in" *Selling v. Radford*, 243 U.S. 46 (1917). *Calvo*, 88 F.3d at 967 (quotation omitted; alterations adopted).

Among the possible defects *Selling* enumerated are (1) a lack of due process, "which is narrowly defined, in this context, as 'want of notice or opportunity to be heard,'" or (2) proof that is "so infirm 'as to give rise to a clear conviction on our part that we could not, consistently with our duty, accept as final the conclusion' of the state court." *Id.* at 966–67 (quoting *Selling*, 243 U.S. at 51); *see also In re Karten*, 293 Fed. App'x 734, 735–36 (11th Cir. 2008).[18]  Missing from this list, of course, is the

---

[18] The view that disbarment may be based on an evidentiary standard less demanding than "beyond a reasonable doubt" is widespread.  *See, e.g.*, *Matter of Palmisano*, 70 F.3d 483, 486 (7th Cir. 1995); *Dailey v. Vought Aircraft Co.*, 141 F.3d 224, 229 (5th Cir. 1998); *In re Liotti*, 667 F.3d 419, 426 (4th Cir. 2011); *U.S. Dist. Court for Eastern Dist. of Washington v. Sandlin*, 12 F.3d 861, 865 (9th Cir. 1993); *Ambrose v. Ambrose*, 309 A.3d 305, 318–19 (Conn. App. Ct. 2024); *In re White*, 355 So.3d 1085, 1091 (La. 2023) (per curiam); *State ex rel. Oklahoma Bar Ass'n v. Bailey*, 530 P.3d 24, 31–32 (Okla. 2023); *In re Nave*, 197 A.3d 511, 513 (D.C. 2018) (per curiam); *In re Petition for Disciplinary Action against Day*, 710 N.W.2d 789, 792 n.10, 793 (Minn. 2006) (per curiam); *Office of Disciplinary Counsel v. Jackson*, 691 N.E.2d 262, 264 (Ohio 1998) (per curiam); *People v. Jackson*, 943 P.2d 450, 451 (Colo. 1997) (per curiam); *In re Conduct of Benjamin*, 823 P.2d 413, 414 (Or. 1991) (per curiam); *Matter of Gold*, 557 A.2d 1378, 1383 (N.J. 1989) (per curiam); *Attorney Grievance Comm'n v. Bailey*, 408 A.2d 1330, 1333 (Md. 1979); *The Florida Bar v. Rayman*, 238 So.2d 594, 596–97 (Fla. 1970) (per

beyond-a-reasonable doubt standard.  Given that this Circuit has, post-*Kleiner*, allowed disbarment based on a less demanding evidentiary standard, *Kleiner* cannot mean that a district court must use the beyond-a-reasonable-doubt standard any time it imposes discipline for conduct that another body might also punish separately by disbarment.

Charles cites no case where any court required the use of a beyond-a-reasonable-doubt standard on the grounds that the attorney's conduct could potentially form the basis, in separate proceedings, for criminal liability or disbarment.  This Court should not become the first to do so.

### c.     Charles overstates the contents of the district court's sanctions order.

In a last-ditch effort to shoehorn himself into the beyond-a-reasonable doubt standard, Charles repeatedly misrepresents what sanctions the district court imposed.   Charles inaccurately states that the district court "referr[ed] Charles for criminal prosecution."  Charles Blue Br. at 24.  In truth, the district court merely referred the matter to the U.S. Attorney to investigate, and the district court expressly

---

curiam); *Burns v. Clayton*, 117 S.E.2d 300, 334 (S.C. 1960) (per curiam); *Office of Disciplinary Counsel v. Salling*, 2013 WL 5737133, *1 (Haw. Oct. 22, 2013).

disavowed any finding that Charles had committed the crime of perjury. Doc. 711 at 224 ("[T]he Court has made no findings of perjury . . . ."); *id.* at 230 (directing Clerk of Court to "refer this matter to the U.S. Attorney for the Middle District of Alabama to investigate whether Carl Charles engaged in any criminal conduct"). And as this Court noted in *Adkins v. Christie*, 227 Fed. App'x 804 (11th Cir. 2007) (per curiam), a referral for potential discipline "cannot be characterized as a sanction or a disciplinary measure" because it merely indicates the district court's view that the attorney's conduct "merits further examination . . . , which may or may not result in a sanction." *Id.* at 806.

Charles also alleges that the district court "publicly censured [him] for allegedly criminal conduct." Charles Blue Br. at 24–25. Again, that is not true. Instead, the court publicly reprimanded Charles "for the bad-faith misconduct described in this order," (Doc. 711 at 229), which, again, disavowed any findings of perjury. And Charles contends, without any citation to the record, that the district court's "sanction order repeatedly accuses Charles of criminal conduct." Charles Blue Br. at 26. That too is false.

### C.    The district court's finding of bad-faith misconduct by Charles was not an abuse of discretion.

The district court's factual findings against Charles represent a permissible view of the evidence, which means that the district court did not abuse its discretion.  *See supra* at 34, 67 (citing case law that the district court's determination need only reflect a permissible view of the evidence).  The district court made its factual findings, including the finding that Charles's false statements to the Panel were the product of bad faith, through a garden-variety credibility determination and evidentiary review.

### 1.    The district court permissibly concluded that Charles intentionally lied to the Panel in bad faith.

The district court's finding that Charles intentionally lied to the Panel in bad faith represents a permissible view of the evidence.

Charles's dispute with the district court's factual findings is narrow and straightforward.  He has never contested that he made false statements to the Panel, only whether he did so intentionally. *See, e.g.*, Charles Blue Br. at 28 (arguing that "the pivotal issue" is "whether Charles' timely correction of his previous testimony . . . was a gotcha moment by the Panel or merely the result of a jogged memory"); Doc. 517

99

at 12.  In other words, the only question is whether his testimony that he did so through innocent forgetfulness (rather than in bad faith) is credible.  The district court made a determination on that point based on the transcript of the relevant testimony to the Panel, Charles's response to the show-cause order, and Charles's live testimony, including his demeanor, before the district court at his show-cause hearing.  This Court should afford that factual finding all the deference ordinarily given to a trial court's factual findings on credibility.[19]  Indeed, to overturn the district court's factual findings, Charles must demonstrate that his alternative explanation—innocent forgetfulness and a memory jogged by hearing his phone number read aloud—is the *only* permissible one.

### a.    The district court's findings represent a permissible view of the evidence.

The district court's finding of bad faith represents a permissible view of the evidence.  The finding is consistent with logic, supported by

---

[19] Charles argues that this "Court need afford no deference to the District Court's characterization or conclusions regarding Charles's testimony before the Panel because this Court is in as good a position as the District Court was to read the transcript."  Charles Blue Br. at 27–28.  But the district court did much more than read the transcript of Charles' testimony to the Panel.  Most importantly, the district court was able to assess Charles's demeanor in person as Charles explained at the show-cause hearing why he had made the false statements.

the district court's assessment of Charles's demeanor, and more satisfactorily explains the evidence than Charles's alternate narrative.

*First*, Charles's testimony before the Panel suggests on its face an intent to deceive. Charles repeatedly denied calling any judge's chambers concerning *Walker* and testified that he was "incredibly certain" he would remember such a call if he had made one. *Vague*, Doc. 109 at 179:14–25, 187:6–19, 191:2–191:7. Yet, moments after learning the Panel had his cell phone number, Charles backtracked, admitting to making precisely the sort of call he had been denying in response to the preceding questions. *Id*. at 191:8–10, 192:7–19. Charles himself recognized in the moment that the natural inference from his admission was that his earlier denials were an attempt to conceal the call. He immediately felt compelled to "apologize for any impression I gave that I was trying to obfuscate" the call. *Id*. at 192:12–13.

*Second*, Charles's testimony at his show-cause hearing was evasive. The district court's observation of his demeanor, a "largely unreviewable" basis for credibility determinations, *Serra v. U.S. Att'y Gen.*, 60 F.4th 653, 660 (11th Cir. 2023), was that it did not suggest candor. Indeed, Charles so persistently avoided directly answering the district court's questions

101

that it had to remind him that it was "here today honestly to assess your credibility" and that "if a witness is evasive with an answer, will not give straightforward answers, gives answers that don't seem to bear to the truth, those are all things that a judge uses to assess credibility."  Doc. 642 at 41:16–25.  Charles's reluctance led his counsel at one point to instruct him on the record, "I would ask, Carl, to the extent you can, just answer directly his questions, okay?"  *Id*. at 43:14–44:12.  The court twice recessed briefly so that Charles and his counsel could confer about his failure to give direct answers and the court's perception of his answers as less than forthcoming.  *Id*. at 39:9–16, 44:21–45:4.  Charles's hesitancy to answer questions clearly and directly further supported the district court's finding that he had acted in bad faith.

*Third*, the district court laid out seven reasons why it did not credit Charles's testimony that he had merely forgotten about the call.  Doc. 711 at 118–20.  Its finding did not rest, as Charles suggests, on speculation or conjecture (Charles Blue Br. at 28), but on a careful analysis of the evidence.[20]  The district court noted, *inter alia*, (1) Charles's failure to

---

[20] The district court's factfinding and reasoning here is not comparable to the findings overturned in the cases Charles cites.  Charles Blue Br. at 28.  In *Tang v. U.S. Att'y. Gen.*, 578 F.3d 1270 (11th Cir. 2009), the court

reveal the truth "until he realized that the Panel had proof of his call"; (2) Charles's failure to explain how he could have forgotten the call despite testifying that he was "incredibly certain" he would remember such a call; (3) a potential motive to conceal the call, namely the optics of making a call to the *Walker* team's preferred judge but not to the judge to whom the case was actually assigned; (4) an additional motive: "Charles's fear that the Panel thought he'd done something wrong—even if he hadn't"; and (5) Charles's demeanor when testifying at his show-cause hearing. Doc. 711 at 118–20. Whether or not this Court would reach the same conclusions from the evidence, they cannot be dismissed as less than a "permissible view[] of the evidence" or "plausible in light of the entire record," as would be required to show clear error. *See J.C. Penney Corp., Inc. v. Oxford Mall, LLC*, 100 F.4th 1340, 1347 (11th Cir. 2024) (quotations omitted).

---

reversed an immigration judge's credibility determination where the judge relied on a factual predicate "invented out of whole cloth" and on a "supposition" that was "not only without support in the record, but . . . contrary to common sense." *Id*. at 1278. Similarly, the Court in *Serra v. U.S. Atty. Gen.*, 60 F.4th 653 (11th Cir. 2023), overturned findings of an immigration judge who discredited an asylum petitioner based on minor perceived inconsistencies, some of which may have been the result of translation issues. *Id*. at 661–64.

### b. Charles's attempts to undermine the district court's credibility finding do not demonstrate clear error.

None of Charles's attempts to second-guess the district court's factual findings get over the "monumental hurdle" of demonstrating clear error. *See United States v. Gonzalez*, 718 Fed. App'x 905, 908 (11th Cir. 2017). Charles's characterization of his decision to correct his testimony as a "timely correct[ion]" (Charles Blue Br. at 31–32) is not compelling because he did not correct his testimony until the Panel revealed that it already knew about his call by reading his phone number aloud. In this vein, Charles's assertion that in a prosecution for perjury he could assert a recantation defense under 18 U.S.C. § 1623(d) (*id.*) ignores a key prerequisite to that defense. The defense is only available "if, at the time the [recantation] is made, the declaration has not substantially affected the proceeding, *or it has not become manifest that such falsity has been or will be exposed*." 18 U.S.C. § 1623(d) (emphasis added).[21] Here, Charles' correction came too late to warrant, let alone compel, an inference that his initial false testimony was innocent.

---

[21] Likewise, Charles' analogy to Rule 11's 21-day safe harbor to correct statements in pleadings (Charles Blue Br. at 32) is inapt because filings subject to Rule 11 are not made under oath. No such grace period exists for sworn testimony.

Nor does the inference that the Panel's reading Charles's phone number alerted him that he was going to be exposed require, as Charles argues, an assumption that Charles forgot he had given the clerk his name and phone number. Charles Blue Br. at 33. Charles could just have easily believed that the Panel would not have known about his discussion with Judge Thompson's clerk, even if he had given the clerk his contact information. Indeed, Charles expressed surprise that the Panel had his phone number, admitting he "did find it unusual." *Vague*, Doc. 109 at 193:16–23.

Similarly, the district court's finding is not rendered implausible by Charles' contention that he misstated the facts because he failed to prepare. Charles Blue Br. at 34. At the critical moment, Charles testified otherwise. In explaining his correction to the Panel, he stated that "there were many things that happened *which I have in preparation for this hearing endeavored to recollect and write down*." *Vague*, Doc. 109 at 192:21–193:3 (emphasis added). Furthermore, Charles was unable to explain at his show-cause hearing why he would not have anticipated testifying in light of the order summoning him and others to appear so that the Panel could inquire about their actions. *See* Doc. 642 at 33:6–

34:7.  At most, the possibility that inadequate preparation led to Charles's failure to disclose the call is one of two permissible views of the evidence, in which case "the factfinder's choice between them cannot be clearly erroneous." *See Brnovich v. Democratic Nat'l Committee*, 594 U.S. 647, 687 (2021) (quotation omitted).

Charles' argument that the call to Judge Thompson's chambers was "neither unusual nor remarkable," (Charles Blue Br. at 35) such that Charles could easily have forgotten it, does not discredit the district court's factfinding.  Asked point-blank whether he would remember making a call to a judge's chambers about *Walker* had he done so, Charles responded, "I am incredibly certain I would, Your Honor." *Vague*, Doc. 109 at 191:2–7.  And although Charles claimed at the show-cause hearing that "[t]he call was just one of many urgent litigation tasks I did during the hectic and stressful week" (Doc. 642 at 7:20–21), he does not identify any other task, urgent or otherwise, that he performed.  Indeed, Charles admitted that he volunteered to make the call "[b]ecause I didn't have a present litigation task." *Id*. at 13:14–16.  The evidence does not support

Charles's contention that the morning of the call was so hectic that he lost track of details.[22]

Moreover, Charles's call to Judge Thompson's chambers was not "routine" for Charles personally or in general. Charles had never called a federal judge's chambers before. Doc. 642 at 18:7–9. Nor did the *Walker* team make a similar call to Chief Judge Marks when the case was assigned to her. *Id.* at 42:21–43:7. Likewise, Charles testified in a declaration submitted in response to his show-cause order that he was "unfamiliar with TROs in general at this point in my practice"—to the point that he did not know what the acronym stood for when testifying before the Panel. Doc. 492 at 87. That testimony cannot be reconciled with a claim that it was routine for Charles to call a judge's chambers about an upcoming TRO motion.[23]

---

[22] Charles points to "corroborat[ion]" of the call's lack of memorability by other witnesses (Charles Blue Br. at 36), but that testimony is immaterial. What is relevant is whether the call was memorable to Charles. Whether the call was memorable to others has no bearing on the credibility of Charles's claim that he forgot about it.

[23] Charles invokes a "Q&A document" circulated among the *Walker* team to demonstrate the call's lack of importance (Charles Blue Br. at 35), but that document is not part of the record. The district court did not consider it in the sanctions proceedings after examining it *in camera* to determine whether attorney-client privilege applied, as Charles and others argued. *See* Doc. 552; Doc. 711 at 103. To the extent Charles argues that the district court erred by *not* considering the Q&A

107

Finally, Charles fails to undermine the district court's analysis with the argument that he lacked a motive to conceal the call. He admitted that he "had in [his] mind that the panel was concerned that someone had made an inappropriate call, and that was alarming to [him]." Doc. 642 at 56:19–21; *see also id.* at 7:2–4; Doc. 492 at 85. The Panel had already expressed interest in the *Walker* team's decision to make a related-case designation and its motion to reassign the case to Judge Thompson (*see, e.g.*, *Vague*, Doc. 1 at 3; *Vague*, Doc. 109 at 48:20, 51:7–10, 87:10–14, 177:14–16), and the *Walker* team had made no equivalent call to Chief Judge Marks. The call need not have been improper for Charles to have a motive for concealing it: avoiding the optics of revealing the disparate decisions about whether to call each judge's chambers was motive enough.

### c.    Charles's alternative explanation based on forgetfulness is far from the only permissible one.

The plausibility of the district court's factual finding is sufficient to end the inquiry under the clear-error standard. Nevertheless, Charles's

---

document, any such error was invited by his extensive argument below that the document was privileged. *Carrizosa*, 47 F.4th at 1327.

alternative explanation that he simply forgot the phone call to Judge Thompson's chambers is flawed in several material respects that further demonstrate it is neither the only nor even the best explanation of his false testimony to the Panel.

Sufficient time had not passed between the call and his testimony that it would be difficult to recall. Charles testified before the Panel about the call only a little over a month after the fact. Doc. 492 at 61–62 (call was made on April 12, 2022); *Vague*, Doc. 109 (testimony on May 20, 2022). Furthermore, Charles's claim that hearing the Panel read his phone number prompted him to search his recollection for a call he had forgotten does not explain why repeated questions about whether he made any calls to a judge's chambers—including one prefaced, "Speaking of good faith, I want you to think very carefully about this next question and answer you're about to give," (*Vague*, Doc. 109 at 187:6–19)—did not prompt the same mental search.

Additionally, Charles's explanation that he missed a subtle change from questions about calls specifically to discuss the assignment of *Walker* to broader ones concerning any call to a judge's chambers about the case does not fit with his story that hearing his phone number jogged

109

his memory.  Charles offers no explanation for how hearing his phone number could have caused him to realize that he had failed to notice a change in the scope of the questions he was being asked.  And if he still thought the questions were limited to calls about case assignment, he would not have needed to disclose the call even after remembering it because the call (according to Charles) was not related to case assignment.  *Vague*, Doc. 109 at 194:3–194:13, 195:1–11.  Charles's eventual disclosure of the call neither includes a caveat that it was not a call about case assignment, as would be expected if he still thought the questions limited in scope but was disclosing his call anyway out of an abundance of caution, nor an explanation that he had belatedly realized the scope of the questions had broadened.  These inconsistencies critically undermine the credibility of Charles's version of events.

* * *

In short, there is no basis to conclude that the district court committed clear error in finding by clear and convincing evidence that Charles acted in bad faith in testifying falsely to the Panel.

110

**IV.    The district court did not violate the due-process rights of Eagan, Doss, or Charles.**

In imposing sanctions, the district court did not violate the due-process rights of Eagan, Doss, or Charles. The due-process requirements attached when the district court issued its show-cause orders, not when the Panel began a factual investigation. The district court provided Eagan, Doss, and Charles with detailed notice of the potential sanctions they faced and the conduct at issue. It also gave them the opportunity to be heard, both in writing and at show-cause hearings, where they enjoyed the protections of cross-examination, representation by counsel, and access to all materials from the Panel's investigative proceedings. Even if due-process requirements applied to the proceedings before the Panel, any defects in the Panel's process do not carry over to the sanctions order because the district court did not rely on the Panel's findings and cured any alleged defects in the Panel's procedures.

**A.    Due-process protections do not apply to investigatory proceedings.**

As an initial matter, the requirements of due process only applied once the district court issued its show-cause orders. Contrary to Appellants' arguments, those requirements do not attach to an

111

investigation like the Panel conducted.  *See Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 654 (1985).

The Supreme Court in *Zauderer* considered and rejected a due-process challenge to purely investigatory proceedings.  The Court explained that Ohio's disciplinary body recommended discipline to the state supreme court but had "no authority to impose discipline itself." *Id*. "[W]hat [was] important," therefore, was "that the Board's recommendations put appellant on notice of the charges he had to answer to the satisfaction of the Supreme Court of Ohio." *Id*.  As a result, the "notice and opportunity to respond [at the adjudicatory phase] were sufficient to satisfy the demands of due process." *Id*. at 655.

Appellants' reliance on *In re Ruffalo*, 390 U.S. 544 (1968), to invalidate the Panel's procedures is misplaced.  The state-court proceedings in *Ruffalo* were adjudicatory proceedings that imposed sanctions even before a federal court relied on the state court's findings to do likewise. *Id*. at 545.

That distinction is important.  Indeed, the highest courts of several states have likewise distinguished *Ruffalo* on the ground that its requirements apply only to adjudicatory proceedings. *See, e.g.*, *In re*

112

*Pendleton*, 870 N.W.2d 367, 383 (Minn. 2015) ("*Ruffalo* is distinguishable because it did not involve the investigatory phase of a disciplinary proceeding . . . ."); *In re Flanagan*, 690 A.2d 865, 874 (Conn. 1997) (concluding that *Ruffalo* does not apply to proceedings that "are investigatory, rather than adjudicatory, in nature"); *In re Unnamed Attorney*, 595 A.2d 256, 258 (Vt. 1991) ("We do not believe that *Ruffalo* creates a constitutional right to notice of possible charges at an investigatory stage of the proceeding."); *In re Henley*, 518 S.E.2d 418, 420 (Ga. 1999); *Matter of Disciplinary Action Against Dvorak*, 580 N.W.2d 586, 590 (N.D. 1998); *Matter of Hawkins*, 589 P.2d 247, 249 n.2 (Wash. 1979).

*Federal Grievance Committee v. Williams*, 743 F.3d 28 (2d Cir. 2014), is instructive on this point too. In that case, the Second Circuit rejected the argument Appellants make here that due process protections "attach" as soon as investigatory proceedings begin. *See id.* at 30–31. Charles points to *Ruffalo*'s statement that the "charge must be known before the proceedings commence." *See* Charles Blue Br. at 40–41 (emphasis omitted). In *Williams*, however, the Second Circuit rightly reasoned that interpreting "the word 'proceedings' in *Ruffalo*" to include

"the opening of an investigation" or even "the filing or service of the charges" would "render the Supreme Court's statement meaningless, as [such interpretations] would require the charges to be known by the attorney before the charges were filed or served." *Williams*, 743 F.3d at 30. Instead, "the question of when disciplinary 'proceedings' have commenced for purposes of *Ruffalo*" requires a "practical answer." *Id.* at 30–31.

A simple analogy demonstrates the soundness of the distinction between investigative and adjudicative proceedings that pervades the case law applying *Ruffalo*. In criminal cases, a prospective defendant does not have the same due-process rights to be represented by counsel or confront witnesses at the investigative grand-jury proceedings as he later enjoys at trial if the grand jury returns an indictment; indeed, he cannot even be present at the grand-jury proceedings. *See* Fed. R. Crim. P. 6(d). Yet Appellants' position that due process attached as soon as the Panel convened its investigative proceedings is akin to an argument that criminal defendants must have due-process protections at the grand jury stage before they can even be charged with wrongdoing. Courts thus rightly apply *Ruffalo* only to adjudicative proceedings, and due process

114

challenges to the Panel's procedures accordingly provide no ground for disturbing the district court's sanctions order.

## B.  The show-cause proceedings provided notice and an opportunity to be heard.

Doss, Eagan, and Charles received the required due-process protections: notice and an opportunity to be heard. Under *United States v. Shaygan*, 652 F.3d 1297 (11th Cir. 2011), due process requires that an attorney "be given fair notice that his conduct may warrant sanctions and the reasons why." *Id.* at 1318 (quoting *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995)). Additionally, "the accused must be given an opportunity to respond, orally or in writing, to the invocation of such sanctions and to justify his actions." *Id.* (quoting *Mroz*, 65 F.3d at 1575–76). Due process imposes no other requirements beyond notice and an opportunity to be heard, even when attorneys are subject to disbarment, a more severe sanction than the district court imposed here. *See, e.g.*, *Matter of Calvo*, 88 F.3d 962, 967 (11th Cir. 1996) (due process is "narrowly defined, in th[e disbarment] context, as 'want of notice or opportunity to be heard'" (quoting *Selling v. Radford*, 243 U.S. 45, 61 (1917))); *In re Walden*, 709 Fed. App'x 644, 645 (11th Cir. 2017) (in

disbarment proceedings, "due process only includes notice and the opportunity to be heard").

### 1.  All appellants received adequate notice.

Eagan, Doss, and Charles received adequate notice of the conduct for which they might be sanctioned and the reasons why.

Eagan and Doss's contention that their respective show-cause orders "did not provide meaningful notice of specific charges" (Eagan/Doss Blue Br. at 77) cannot withstand scrutiny.  The district court erred in *Shaygan* because it "did not provide [the sanctioned attorneys] with notice that it was considering a public reprimand."  652 F.3d at 1318.

In stark contrast to *Shaygan*, Eagan and Doss received detailed notice.  The show-cause orders itemized the conduct for which each attorney might be sanctioned and the sanctions the court was considering.  Doc. 483 at 10–12 (Doss); Doc. 484 at 10–12 (Eagan).  And, as discussed above, *supra* at 45–46, this Court has made clear that case law can provide notice to an attorney of prohibited conduct, and *BellSouth* provided that advance notice to Eagan and Doss.  Thus, Eagan

and Doss's complaint (Eagan/Doss Blue Br. at 78) about the district court's reference to *BellSouth* in the show-cause orders rings hollow.

While Eagan and Doss also criticize the notice they received prior to the Panel's investigative proceedings, their description of the notice is misleading. They state that the notice advised them that the Panel would "inquire about the issues raised by counsel's actions." Eagan/Doss Blue Br. at 79 (quoting *Vague*, Doc. 1 at 1). But they fail to mention that the order recited in detail the procedural history of the cases filed by Eagan and Doss and expressly identified case law that prohibits judge-shopping. *Vague*, Doc. 1 at 2–5. Thus, even if the notice requirements applied to the Panel's proceedings (and they do not), Eagan and Doss received sufficient notice.

Charles does not contend that the district court's show-cause order did not provide him sufficient notice.[24] Instead, Charles complains about the notice he received when the Panel summoned him to its investigative proceedings. In addition to the absence of any notice requirement for the Panel proceedings, Charles' argument fails even if due process required him to have notice during the investigative phase.

---

[24] In any event, he too received detailed notice. Doc. 481 at 12–16.

Although Charles claims that the Panel failed to provide him with "advance notice that the related case designation and the telephone call to Judge Thompson's chambers were to be the subject of the Panel's inquiry" (Charles Blue Br. at 45), he ignores the initial order's discussion of the *Walker* team's efforts "to reassign the case to Judge Thompson as related to a case that Judge Thompson had previously decided but that had been closed over fifteen months earlier." *Vague*, Doc. 1 at 3. The order thus put Charles on notice that efforts to get *Walker* assigned to Judge Thompson were among the topics at issue, making communications with Judge Thompson's chambers in the immediate aftermath of filing plainly relevant. The order's discussion of judge-shopping (*id.* at 2, 5 n.5) would also have alerted a prudent reader to expect questions about communications with Judge Thompson's chambers, particularly given the related-case designation.

Regardless, whether Charles knew the phone call to Judge Thompson's chambers or the related-case designation would be topics of the Panel's questions is beside the point because Charles was not sanctioned for the related-case designation or the call; he was sanctioned for testifying falsely to the Panel. Charles can hardly complain that he

118

lacked notice that he could be disciplined for misleading the Panel, which gave several warnings about the importance of providing truthful testimony. *See Vague*, Doc. 109, at 18:18–19:4, 73:24–74:8, 94:6–16. And even without warnings like those the Panel gave, attorneys are always on notice that they must testify truthfully in judicial proceedings. *See, e.g.*, *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1546 (11th Cir. 1993) ("All attorneys, as 'officers of the court,' owe duties of complete candor and primary loyalty to the court before which they practice."); N.D. Ala. L.R. 83.1(f); Ala. R. Professional Conduct 3.3; Am. Bar Ass'n Model R. Prof. Conduct 3.3. For the same reason, the cases Charles cites regarding inadequate notice are inapposite. Those cases involved attorneys who, unlike Charles, did not receive clear notice that the court was considering sanctioning them at all or of what conduct formed the basis for potential sanctions.[25]

---

[25] *In re Gillespie*, 2023 WL 7548181, *2 (4th Cir. Nov. 14, 2023) (district court "failed to provide adequate notice to [the attorney] of its intent to rely on" a particular ground for discipline); *Kornhauser v. Comm'r of Soc. Sec.*, 685 F.3d 1254, 1258 (11th Cir. 2012) (only notice of possible sanctions "came in the form of a footnote to [an order] addressing the merits" of the case, and court did not give attorney an opportunity to respond); *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1257 (11th Cir. 2003) (finding "material variance between the court's oral Rule 11(c)(1)(B) notice . . . and the sanction imposed"); *Adkins v. Christie*, 227 Fed. App'x 804, 806 (11th Cir. 2007) (notice of a "hearing on their Motion

119

## 2.    All appellants had a full and fair opportunity to be heard.

The district court also afforded Appellants a full and fair opportunity to defend themselves. Appellants submitted briefing in response to the show-cause orders and were represented at their hearings by counsel. Doc. 514 (Eagan and Doss brief); Doc. 517 (Charles brief); Doc. 642 at 28:12–29:18 (appearances of counsel at show-cause hearing).[26] At the hearings, each respondent had the opportunity to call witnesses and to cross-examine each witness.[27]

* * *

In sum, the district court was transparent about what conduct was at issue and why that conduct was potentially sanctionable, and its process satisfies *Shaygan*'s basic requirements of notice and an opportunity to be heard because it gave Appellants clear notice of what conduct was at issue and imposed sanctions for precisely that conduct.

---

to Withdraw was insufficient to provide [the attorneys] with notice of the possibility of sanctions").

[26] Eagan and Doss also submitted a response to their co-respondents' show-cause briefing. Doc. 537.

[27] Doc. 636 at 35:21–36:4, 101:6–18; Doc. 640 at 47:25–49:18, 84:3–16, 117:13–119:21, 137:22–138:9, 189:1–15, 213:25–214:8; Doc. 642 at 72:12–74:10, 130:7–16, 147:11–18.

*See In re Grodner*, 587 Fed. App'x 166, 170 (5th Cir. 2014) (procedures materially identical to what the district court employed here "checked all the required procedural boxes").

### C.    The district court's show-cause proceedings moot any concerns with the Panel proceedings.

Appellants' objections to the Panel proceedings would have no significance for the validity of the district court's sanctions order even if those proceedings had required due process.  Eagan and Doss seek to portray the Panel's investigation as lawless persecution. *See* Eagan/Doss Blue Br. at 70, 74–75.  With limited exceptions, however, they fail to argue in any detail how or why the procedures they describe were improper.  Because "a passing reference to an issue is not enough to put the matter before" this Court, it need "not address these conclusory assertions." *Cheshire Bridge Holdings, LLC v. City of Atlanta, Ga.*, 15 F.4th 1362, 1368 n.2 (11th Cir. 2021); *see also Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (an "issue is deemed waived" where the brief "refers to" the issue but "elaborates no arguments on the merits" concerning it).

Regardless, Appellants' due-process arguments concerning the Panel proceedings rely on the implicit premise that if the Panel failed to

provide due process, that failure taints the sanctions order, notwithstanding the curative steps taken by the district court. That premise is wrong.

The district court made independent findings rather than relying on the Panel's findings. In making those independent findings, the district court took affirmative steps to cure any possible defects in the Panel proceedings by providing Appellants with all the procedural protections they claim were required at the investigative stage and granting them access to the full record of the Panel's investigation. Finally, Appellants reasserted their Panel testimony and did not object to the reassertion of Panel testimony by other show-cause respondents, thus forfeiting any objections to the consideration of that testimony.

### 1. The district court did not rely on the Panel's findings.

Any alleged due-process errors by the Panel do not undermine the district court's sanctions order because the district court did not rely on or incorporate the Panel's findings. In essence, the district court restarted the process from scratch to ensure that respondents had a full and fair opportunity to defend themselves. In the sanctions order, the district court repeatedly and expressly made clear that it was not relying

on the Panel's findings. *See, e.g.*, Doc. 711 at 143 n.31, 153, 158 n.35, 159, 167.[28]  This lack of reliance is another crucial distinction from *Ruffalo*, where the Court emphasized that the Sixth Circuit had relied on prior state court proceedings to discipline an attorney: "There was no de novo hearing before the Court of Appeals. Rather, it rested on the Ohio court's record and findings."  390 U.S. at 549; *see also id*. at 546 (noting that "the Court of Appeals relied" on the state court proceedings).  The distinction matters because in *Ruffalo*, "any constitutional defects in what the Ohio court did" were "reflected in what the Court of Appeals decided."  *Id*. at 550.  Not so here.  The district court scrupulously avoided reliance on the Panel's findings, reaching its own independent factual findings only after receiving extensive written submissions and live testimony at the show-

---

[28] Appellants take issue with the procedure whereby the special master questioned lawyers in junior roles without counsel present.  But the district court did "not consider[] the testimony of any witness who was questioned by [the special master] for the purpose of imposing sanctions."  Doc. 711 at 167.  Moreover, Appellants were not questioned without counsel, and they cannot vicariously assert a third party's right to counsel.  *See Texas v. Cobb*, 532 U.S. 162, 171 n.2 (2001) (right to counsel is a personal right); *Alderman v. United States*, 394 U.S. 165, 174 (1969) ("[P]ersonal rights . . . may not be vicariously asserted.").  And in any event, Charles's counsel accepted the Panel's proposed solution to his concerns with the procedure, while Eagan and Doss did not object at all until nearly a month after the fact. *Vague*, Doc. 109 at 82:10–84:8; *see* Eagan/Doss Blue Br. at 79 (challenging district court's finding that June 17, 2022 objections were untimely).

cause hearings. The sanctions order is therefore unaffected by any alleged defects in the Panel's investigative proceedings.

Nor did the district court covertly rely on the Panel's findings as Charles suggests. Charles contends that the sanctions against him "are based on the assumption that Charles intentionally lied to the Panel" and thus must have been lying again when he denied doing so. Charles Blue Br. at 52. The district court made no such assumption. Instead, the district court based its conclusion that Charles had intentionally lied on the transcript of Charles's testimony before the Panel, his various submissions to the district court in response to the show-cause order, and his demeanor and testimony before the district court. *See, e.g.*, Doc. 711 at 109 ("These findings are based on the undisputed facts and admissions and the Court's assessment of each Respondent's credibility, . . . [including] their demeanor on the stand"); *id.* at 118–26.

Finally, while Eagan and Doss argue that a "finding of misconduct" by the Panel is a "cognizable injury" even if the Panel did not sanction them (Eagan/Doss Blue Br. at 75), that argument falls short for at least three reasons.

124

*First*, the Panel's finding of misconduct was tentative and subject to modification.  As the Panel explained in a clarifying order, its "Final Report of Inquiry" was "neither a final decision under 28 U.S.C. § 1291 nor an interlocutory decision under 28 U.S.C. § 1292 and requires further proceedings" in the district court.  *Vague*, Doc. 99.  The Panel expressly contemplated that the district court's subsequent proceedings might include "accepting, rejecting, or modifying in whole or in part the Panel's findings." *Id*.  Because the Panel's findings were tentative and subject to modification by Judge Burke, they cannot be considered on a standalone basis apart from the district court's final findings of fact in the sanctions order.

*Second*, Eagan and Doss's argument would support, at most, vacatur of the Panel's final report.  Eagan and Doss, however, never requested that the district court vacate the Panel's report and have not asked this Court to do so.  *See* Eagan/Doss Blue Br. at 80 (requesting only vacatur of sanctions order).  Eagan and Doss cannot challenge on appeal the district court's failure to do something they never requested.  *See Reiterman v. Abid*, 26 F.4th 1226, 1233 (11th Cir. 2022); *Carter v. DecisionOne Corp. Through C.T. Corp. Sys.*, 122 F.3d 997, 1004 (11th Cir.

1997); *see also Mago Int'l. v. LHB AG*, 833 F.3d 270, 274 (2d Cir. 2016) (declining to consider argument because appellant "never requested this relief from the District Court").

*Third*, any error in the Panel's proceedings would be harmless, as the district court reached the same finding of misconduct concerning Eagan and Doss after holding show-cause hearings that afforded them all the procedural protections they argue were lacking in the Panel's proceedings. *See Skanska USA Civil Southeast Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1309 (11th Cir. 2023) ("An error is harmless unless . . . the reviewing court cannot confidently say that the judgment was not substantially swayed by the error." (quotation omitted)).

## 2. The district court cured any possible defects in the Panel's procedures.

The district court did not merely avoid reliance on the Panel's findings; it took affirmative steps to cure the aspects of the Panel proceedings that Appellants challenge. Due process violations "do not become complete unless and until" they go uncured. *Ogburia v. Cleveland*, 380 Fed. App'x 927, 929 (11th Cir. 2010) (quotation omitted). "In other words, [a party] may cure a procedural due process deprivation by providing a later procedural remedy . . . ." *Id.*; *see also Club Madonna,*

*Inc. v. City of Miami Beach*, 924 F.3d 1370, 1379 (11th Cir. 2019) (appeal procedure for city's suspension of business license "satisfies due process because the [reviewing court] has the power to remedy any procedural deficiencies and cure violations of due process").

Nor is *Carlucci v. Piper Aircraft Corp., Inc.*, 775 F.2d 1440 (11th Cir. 1985), to the contrary as Charles suggests. In *Carlucci*, the district court made findings of bad-faith conduct in discovery orders and later imposed sanctions for that conduct after issuing a show-cause order and holding a hearing. *Id.* at 1451–52. This Court affirmed the sanctions because the district court provided due process to the attorney before entering the discovery orders that made the finding of bad faith. *Id.* at 1452–53. Nothing about the facts or reasoning of *Carlucci* suggests that if the district court had *not* afforded the attorney due process before entering the discovery orders, it could not have cured that defect through the show-cause proceedings.

Here, Appellants received ample opportunity to hear the testimony of other witnesses, conduct cross-examination, and submit briefing at the show-cause hearings, curing any alleged flaw in the Panel's investigative proceedings. The district court also granted full access to all witnesses'

testimony in the Panel proceedings.  Doc. 459 (order unsealing Panel's final report and providing rationale for previous text orders unsealing of other *Vague* filings).[29]  The district court's actions effectually remedied any defect allegedly present in the Panel's investigative proceedings.

### 3. Doss, Eagan, and Charles all reasserted their Panel testimony and did not object to other respondents doing the same.

Eagan and Doss's complaint that the district court "relied on panel testimony throughout the process" (Eagan/Doss Blue Br. at 79) is a non-starter.  As for their own Panel testimony, Eagan and Doss waived any due-process objections to the district court's use of testimony given to the Panel when they reasserted their testimony before the Panel without amendment at the beginning of their show-cause hearings.  Doc. 642 at 82:11–20 (Eagan), 131:13–22 (Doss).[30]  Crucially, they likewise made no objection when the other respondents similarly reasserted their

---

[29] Even before unsealing the full record in *Vague*, the district court granted numerous requests to admit additional evidence.  Doc. 449.

[30] Eagan and Doss make the bizarre complaint that the district court relied on testimony before the Panel in connection with "the court's invocation of the crime-fraud exception."  Eagan/Doss Blue Br. at 79.  But the district court ruled favorably to Eagan and Doss that the crime-fraud exception did not apply to the particular document at issue.  *See* Doc. 711 at 103 (Q&A document was not "considered for any purpose" in issuance of sanctions order).

testimony before the Panel. *Id*. at 4:19–5:4; Doc. 636 at 5:20–6:11, 51:23–52:15; Doc. 640 at 37:24–38:11, 83:5–19, 94:25–95:10, 120:2–13, 163:4–14, 189:24–190:11.  By reaffirming their testimony and not objecting to the same reaffirmation by the other respondents in a setting where all parties were represented by counsel, were able to conduct cross-examination, and had ample opportunity to respond orally and in writing to the charges, Eagan and Doss rendered moot any due-process concerns with the setting in which the original testimony was given.

### 4.    Appellants were not prejudiced by the Panel's procedures.

Additionally, Appellants identify no prejudice they suffered from any purported deficiency in the Panel's proceedings.  This Circuit has consistently required a showing of actual prejudice before granting relief on due process grounds across a variety of contexts.  *See, e.g.*, *United States v. Robinson*, 767 F.2d 765, 770–71 (11th Cir. 1985) (criminal defendant failed to show "the prejudice necessary to establish an infringement of either his due process or speedy trial rights"); *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) (social security); *Priva v. U.S. Attorney General*, 34 F.4th 946, 954 (11th Cir. 2022) (immigration); *Rimmer v. Secretary, Fla. Dep't of Corrections*, 876 F.3d 1039, 1054 (11th

Cir. 2017) (habeas petition based on *Brady* violation). Appellants identify no way in which the Panel's inquiry, let alone the district court's sanctions order, would have played out differently had the Panel provided additional procedural protections. Absent such a showing of prejudice, the Panel's procedures would not be grounds for reversal even if they violated due process.

* * *

The due-process objections raised by Doss, Eagan, and Charles lack merit. Consistent with *Shaygan*, the district court's show-cause proceedings provided detailed notice and a robust opportunity to be heard, which are the only procedural protections required for sanctions under a court's inherent authority. Appellants' separate attacks on the investigative Panel's procedures are fundamentally flawed. Due-process rights do not attach at the investigative stage, and the district court did not rely on the Panel's findings. To the contrary, the district court remedied any alleged problems with the Panel's procedures by affording Appellants every protection they argue was lacking at the investigative stage before it made independent factual findings.

130

## CONCLUSION

For the foregoing reasons, the district court's order imposing sanctions on Doss, Eagan, and Charles should be affirmed.

November 26, 2025                    Respectfully submitted,


_____
/s/ *Matthew H. Lembke*
One of the Attorneys for Appellee

131

OF COUNSEL
Matthew H. Lembke
Riley A. McDaniel
Christopher A. Wetzel
J. Turner Collins
BRADLEY ARANT BOULT CUMMINGS LLP
1819 Fifth Avenue North
Birmingham, Alabama 35203
Telephone: (205) 521-8000
mlembke@bradley.com
rmcdaniel@bradley.com
cwetzel@bradley.com
tcollins@bradley.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, the undersigned counsel certifies that this brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief contains 27,035 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and 11th Cir. R. 32-4.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 365 in Century Schoolbook, font size 14.

/s/ *Matthew H. Lembke*
Of Counsel

## CERTIFICATE OF SERVICE

I certify that, on November 26, 2025, the foregoing was filed using

the CM/ECF system, which will serve notice on all counsel of record.

/s/ *Matthew H. Lembke*

Of Counsel
